# Exhibit 3

**AMERICAN ARBITRATION ASSOCIATION**

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**

**ICDR Case No. 01-21-0017-1584**

---

*In the Matter of the Arbitration between:*

**Occidental Exploration & Production Company,**

*Claimant,*

- against -

**Andes Petroleum Ecuador Ltd.**

*Respondent.*

---

## FINAL AWARD

International Arbitration Tribunal

Before the Arbitral Tribunal composed of:

Jesse R. Pierce, Esq.
Lucy F. Reed, Esq.
John J. Buckley, Jr., Esq. (Chairperson)

July 8, 2023

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................... 1

    A. Parties and Counsel......................................................................................... 1

    B. Tribunal and Case Administrator ................................................................... 2

    C. Arbitration Agreement, Procedural Rules, Seat, and Governing Law................... 3

        1. Arbitral Jurisdiction ............................................................................. 3

        2. Procedural Rules and Seat ................................................................... 6

        3. Governing Law ..................................................................................... 6

II. FACTUAL BACKGROUND........................................................................................ 7

    A. The Parties' Contractual Relationship ........................................................... 7

        1. Farmout Agreement and JOA ............................................................. 7

        2. The Letter Agreement ......................................................................... 9

    B. Occidental-Ecuador ICSID Arbitration and ICSID Award ............................. 13

    C. ICSID Annulment Decision and Final ICSID Award......................................... 15

    D. Occidental-Ecuador Settlement Agreement.................................................... 16

    E. The Andes-OEPC Arbitration and Final Award ............................................. 16

    F. Confirmation Proceedings and Entry of Judgment......................................... 22

III. PROCEDURAL HISTORY......................................................................................... 23

IV. PRINCIPAL CONTENTIONS OF THE PARTIES ......................................................... 39

    A. Claimant's Position....................................................................................... 39

    B. Respondent's Position.................................................................................... 42

V. ANDES' AFFIRMATIVE DEFENSES: DOCTRINE OF RES JUDICATA ................. 44

    A. Positions of the Parties.................................................................................. 45

        1. Respondent's Position.......................................................................... 45

        2. Claimant's Position............................................................................. 48

    B.      Tribunal's Analysis and Decision .................................................................. 50

VI.    COSTS ........................................................................................................... 61

    A.      Positions of the Parties ............................................................................. 62

    B.      Tribunal's Analysis and Decision .............................................................. 66

            1.      Attorneys' Fees ............................................................................. 66

            2.      Costs and Disbursements ............................................................. 67

            3.      Factual Witness and Expert Witness Costs ................................. 68

            4.      Arbitration Costs .......................................................................... 68

            5.      Summary of Costs ......................................................................... 69

VII.    CONCLUSION AND AWARD ..................................................................... 70

## I.    INTRODUCTION

1.      Claimant Occidental Exploration and Production Company ("**OEPC**") commenced this Arbitration against Respondent Andes Petroleum Ecuador Ltd. ("**Andes**") on November 1, 2021. OEPC asserts claims for breach of contract based on Andes' failure to pay or reimburse it for alleged losses, costs and expenses it incurred as Operator in conducting Joint Operations, including legal proceedings, relating to oil exploration rights.

### A.    Parties and Counsel

2.      The Claimant, OEPC, is incorporated under the laws of the State of California. Its principal place of business is S. Greenway Plaza, Houston, Texas 77046. It is wholly owned, ultimately, by Occidental Petroleum Corporation ("**OPC**"), which is incorporated under the laws of the State of Delaware. Together, OEPC and OPC will be referred to as "**Occidental**."

3.      OEPC is represented in this Arbitration by:

> Kathy Patrick, Esq.
> Ayesha Najam, Esq.
> Erica Krennerich, Esq.
> Gabriel Kaim, Esq.
> Mark Dore, Esq.
> Gibbs & Bruns, LLP
> 1100 Louisiana Street
> Suite 5300
> Houston, TX 7702
> (713) 650-8805
> kpatrick@gibbsbruns.com
> anajam@gibbsbruns.com
> ekrennerich&@gibbsbruns.com
> gkaim@gibbsbruns.com
> mdore@gibbsbruns.com
>
> Kenneth E. Warner, Esq.
> Warner Partners, P.C.
> 950 Third Avenue, 31st Floor
> New York, NY 10022
> (212) 953-8000, ex. 103
> kwarner@warnerpc.com

4.      The Respondent, Andes, is incorporated under the laws of Barbados. Its principal place of business is Avenida Naciones Unidas E-10-44 y República de El Salvador, Edificio Citiplaza, Quito, Ecuador. It is wholly owned by Andes Petroleum Company Limited ("**Andes Petroleum**"), a corporation incorporated in the British Virgin Islands. Andes Petroleum is owned, ultimately, by two state-owned Chinese companies, China National Petroleum Company ("**CNPC**") and China Petrochemical Corporation ("**Sinopec**"). At times pertinent to this Arbitration, Andes was known variously as City Investing Company, Ltd.; AEC Ecuador, Ltd.; and, as of 2006, Andes Petroleum Ecuador Ltd.

5.      Andes is represented in this Arbitration by:

> Christian Leathley, Esq.
> Liang-Ying Tan, Esq.
> Benjamin Guthrie, Esq.
> Daniela Páez, Esq.
> Herbert Smith Freehills New York LLP
> 450 Lexington Avenue
> 14th Floor
> New York, NY 10017
> (917) 542-7801
> christian.leathley@hsf.com
> liangying.tan@hsf.com
> benjamin.gutherie@hsf.com
> daniela.paez@hsf.com

### B.      Tribunal and Case Administrator

6.      The members of the Tribunal are:

> Jesse R. Pierce, Esq.
> Pierce & O'Neill LLP
> 4203 Montrose Boulevard
> Houston, Texas 77006
> (713) 634-3600
> jpierce@pierceoneill.com
>
> Lucy F. Reed, Esq.
> Arbitration Chambers
> c/o 252 7th Avenue #15J
> (917) 280-5996
> lucy.reed@arbchambers.com

John J. Buckley, Jr., Esq., *Chairperson*
2955 Newark St NW
Washington, DC 20008
(202) 591-5477
jbuckley@wc.com

7.     The Arbitration is being administered by the International Centre for Dispute Resolution ("**ICDR**"), the international division of the American Arbitration Association.

### C.     Arbitration Agreement, Procedural Rules, Seat, and Governing Law

8.     As agreed between the Parties, and confirmed in Procedural Order No. 1 ("**PO1**"), the Arbitration arises out of three agreements: the "**Farmout Agreement,**"[1] the "**Joint Operating Agreement**" ("**JOA**"),[2] and the "**Letter Agreement**."[3]

### 1.     Arbitral Jurisdiction

9.     Section 7.01 of the Farmout Agreement provides:[4]

> If OEPC and AECI or their respective successors, assigns or legal representatives are unable to amicably resolve any dispute or difference arising under or out of, in relation to or in any way connected with (i) this Agreement, the JOA, the Participating Agreements, or any of them, or (ii) any operations, transactions, actions or inactions conducted, arising under or out of, in relation to or in any way connected with this Agreement, the JOA, the Participating Agreements, or any of them (whether contractual, tortious, equitable, statutory or otherwise), including, without limitation, the negotiation, execution, existence, amendment, validity, enforceability, performance, non- performance, breach, termination, interpretation or construction thereof, such matter shall be finally and exclusively referred to and settled by arbitration under the Commercial Arbitration Rules of the American Arbitration Association pursuant and subject to the arbitration procedures set forth in Exhibit H attached hereto and incorporated herein; provided that, to the extent permitted by the law of arbitration the scope of application of the Commercial Arbitration Rules of the American Arbitration Association shall be modified as may be necessary to include all of the above referenced matters within the scope of the application of such rules. In the event of any conflict between the Commercial

---

[1] JX1, Farmout Agreement, October 1, 2000.

[2] JX2, JOA, October 31, 2000.

[3] JX3, Letter Agreement, February 22, 2006.

[4] JX1, Farmout Agreement, § 7.01.

Arbitration Rules of the American Arbitration Association and the arbitration procedures set forth in Exhibit H, the arbitration procedures set forth in Exhibit H shall govern and control.

10.     Exhibit H to the Farmout Agreement provides:[5]

The arbitration procedures referred to in Section 7.01 of the Farmout Agreement to which this Exhibit is attached shall be as follows:

1.  Any party may submit any such dispute or difference referred to in said Section 7.01 to arbitration by notice to the other parties.

2.  The arbitration shall be heard and determined by three (3) arbitrators. Each side shall appoint an arbitrator of its choice within thirty (30) days of the submission of a notice of arbitration. The party-appointed arbitrators shall in turn appoint a presiding arbitrator of the tribunal within thirty (30) days following the appointment of both party-appointed arbitrators. If the party-appointed arbitrators cannot reach agreement on a presiding arbitrator of the tribunal and/or one party refuses to appoint its party-appointed arbitrator within said thirty (30) day period, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitration tribunal shall be made by majority vote.

3.  Unless otherwise expressly agreed in writing by the parties to the arbitration proceedings:

    (a)  The arbitration proceedings shall be held in New York City, New York;

    (b)  The arbitration proceedings shall be conducted in the English language and the arbitrator(s) shall be fluent in the English language;

    (c)  The arbitrator(s) shall be and remain at all times wholly independent and impartial;

    (d)  The arbitration proceedings shall be conducted under the Arbitration Rules of the American Arbitration Association, as amended from time to time;

    (e)  Any procedural issues not determined under the arbitral rules selected pursuant to clause 3(d) above shall be determined by a majority of the

_____

[5] *Id.*, Exhibit H.

arbitration panel, other than those laws which would refer the matter to another jurisdiction;

(f)    The costs of the arbitration proceedings (including attorneys' fees and costs) shall be borne in the manner determined by the arbitrators);

(g)    The decision of the sole arbitrator or a majority of the arbitrators, as the case may be, shall be reduced to writing; final and binding without the right of appeal; the sole and exclusive remedy regarding any claims, counterclaims, issues or accountings presented to the arbitrator; made and promptly paid in U.S. dollars free of any deduction or offset; and any costs or fees incident to enforcing the award, shall to the maximum extent permitted by law be charged against the party resisting such enforcement;

(h)    Consequential, punitive or other similar damages shall not be allowed except those payable to third parties for which liability is allocated among the parties by the arbitral award;

(i)    The award shall include interest from the date of any breach or violation of this Agreement, as determined by the arbitral award, and from the date of the award until paid in full, at the Agreed Interest Rate as defined in the JOA;

(j)    Judgment upon the award may be entered in any court having jurisdiction over the person or the assets of the party owing the judgment or application may be made to such court for a judicial acceptance of the award and an order of enforcement, as the case may be;

(k)    The arbitration shall proceed in the absence of a party who, after due notice, fails to answer or appear. An award shall not be made solely on the default of a party, but the arbitrators shall require the party who is present to submit such evidence as the arbitrators may determine is reasonably required to make an award;

(l)    If an arbitrator should die, withdraw or otherwise become incapable of serving, or refuse to serve, a successor arbitrator shall be selected and appointed in the same manner as the original arbitrator; and

(m)    The arbitrator(s) shall not have jurisdiction or authority to add to, detract from or alter in any way the provisions of this Agreement.

11. Section 18.2 of the JOA includes substantively similar, although not identical, provisions to those in Exhibit H of the Farmout Agreement.[6]

12. Paragraph 5 of the Letter Agreement provides:[7]

> The governing law and dispute resolution provisions of the Farmout Agreement shall apply to this letter, mutatis mutandis.

### 2. Procedural Rules and Seat

13. Pursuant to Exhibit H to the Farmout Agreement, and as confirmed in PO1:

    a) the place of arbitration is New York, New York, USA; and

    b) the Arbitration shall be conducted under the AAA Commercial Arbitration Rules as amended and effective from October 1, 2013 ("**AAA Rules**"), including also the Procedures for Large, Complex Commercial Cases, and any procedural issues not determined under the AAA Rules shall be determined by the Tribunal after consultation with the Parties.

### 3. Governing Law

14. Pursuant to Section 7.02 of the Farmout Agreement, "this Agreement shall be governed and construed, interpreted and applied in accordance with the laws of the State of New York, United States of America, excluding any choice of law rules or conflicts of law principles which would refer the matter to the laws of another jurisdiction, except to the extent that the laws of Ecuador require application of the laws of Ecuador to the Participating Agreements and Block 15 or other property situated in or operations or activities conducted in Ecuador."

15. Section 18.1 of the JOA states: "This Agreement shall be governed by, construed, interpreted and applied in accordance with the laws of New York, excluding any choice of law rules which would refer the matter to the laws of another jurisdiction."[8]

---

[6] JX2, JOA, § 18.2.

[7] JX3, Letter Agreement, February 22, 2006, ¶ 5.

[8] JX2, JOA, § 18.1.

## II.  FACTUAL BACKGROUND

### A.  The Parties' Contractual Relationship

#### 1.  Farmout Agreement and JOA

16.     Claimant OEPC was party to a "**Participation Contract**" dated May 21, 1999 with Ecuador's state-owned oil company, PetroEcuador, for the exploration and exploitation of hydrocarbons in a defined area in the Ecuadorian Amazon known as Block 15.[9] As explained below, Respondent Andes later acquired a 40% economic interest in OEPC's oil exploration rights.

17.     On October 19, 2000, OEPC and a subsidiary of Alberta Energy Corporation ("**AEC**"), City Investing Co. Ltd., entered into a Farmout Agreement by which OEPC divested to AEC's subsidiary 40% of its economic interest in Block 15.[10] The AEC subsidiary that held the 40% economic interest was later renamed "**AEC Ecuador**." Andes is the successor in interest to AEC Ecuador. The Farmout Agreement provided that OEPC was to retain nominal legal title to the AEC subsidiary's 40% economic interest in Block 15 under the Participation Contract until such time as the Government of Ecuador gave its formal approval to the transfer of interest and title to the AEC subsidiary as contemplated by the Farmout Agreement. Upon Ecuador's formal consent, AEC Ecuador would obtain legal title to its 40% economic interest.[11] Although OEPC continued to have many discussions with the Government over the ensuing years, Ecuador never consented to the transfer of interest. Consequently, 100% of the legal title remained with OEPC.

18.     On October 31, 2000, OEPC and AEC Ecuador entered into a Joint Operating Agreement (the "**JOA**") to implement the Farmout Agreement and govern their relationship concerning the operation of Block 15.[12] OEPC was the Operator in the conduct of Joint Operations under both the Farmout Agreement and the JOA. Pursuant to the JOA, OEPC and AEC Ecuador each confirmed that its rights and interests arising under the Participation Contract would be enjoyed

---

[9] JX7, Andes-OEPC Final Award, March 26, 2021, ¶ 12.

[10] *Id.*, §§ 2.01-2.07; JX1, Farmout Agreement.

[11] *Ibid.*

[12] JX2, JOA, October 31, 2000.

in accordance with their respective 60:40 split recognized in the Farmout Agreement, and that all liabilities and expenses in connection with joint operations would be shared according to that same 60:40 division. AEC Ecuador also committed to a series of payments to OEPC to earn its Farmout Interest as well as to contribute 40% to Capex going forward.

19.     In 2002, AEC merged with PanCanadian Enderby Company to create Encana Corporation ("**Encana**"). Encana thereby became the indirect owner of the 40% economic interest in Block 15 held by AEC Ecuador.[13]

20.     By 2004, AEC Ecuador had made all required capital payments to OEPC to earn its farmout interest. In July 2004, OEPC formally requested the Ecuadorian Government to consent to the transfer of the 40% interest to AEC Ecuador under the Farmout Agreement. The Government did not consent, however.

21.     Beginning in 2002, OEPC had engaged in an international arbitration against Ecuador to recover refunds of value-added tax ("**VAT**"). In July 2006 the VAT tribunal issued a $75 million award in OEPC's favor, finding that Ecuador's conduct had been unfair and discriminatory. Soon thereafter, Ecuador began threatening OEPC with termination of the Participation Contract. It cited several bases, including that OEPC's transfer to AEC Ecuador of a 40% economic interest in the farmout property (i.e., the Participation Contract for Block 15) was done without Ecuador's consent and in breach of Ecuadorian law. In addition, Ecuador made clear that it would not consent to a transfer of legal title.

22.     On September 8, 2004, Ecuador's Minister of Energy and Mines instructed PetroEcuador to initiate proceedings to terminate the Participation Contract for Block 15 (the "***Caducidad Proceedings***"), including on the ground that OEPC had failed to obtain the Ministry's authorization for the assignment of 40% of OEPC's interest in Block 15 to AEC Ecuador.

23.     In August 2005, Encana and Andes Petroleum entered into a Share Sale Agreement by which Encana sold, *inter alia*, its ownership in AEC Ecuador to Andes Petroleum, Respondent's parent. The Share Sale Agreement, as modified, closed on February 28, 2006, after which AEC Ecuador was renamed Andes Petroleum Ecuador Ltd., i.e., Andes, the Respondent in this

---

[13] JX7, Andes-OEPC Final Award, March 26, 2021, ¶ 15.

Arbitration.

## 2. The Letter Agreement

24.     Given the threat that the Ecuadorian authorities would take actions that interfered with OEPC's and AEC Ecuador's rights concerning Block 15, the parties to the Share Sale Agreement and OEPC engaged in discussions to address the effect of the *Caducidad* Proceedings and, among other things, what would happen in the event of termination of the Participation Contract in a "*Caducidad* **Decree**." To address that contingency, Andes and OEPC entered into a Letter Agreement dated February 22, 2006 (the "**Letter Agreement**")[14] but effective February 28, 2006, explicitly amending the Farmout Agreement and JOA with respect to the Caducity Proceedings.

25.     The Letter Agreement stated that it constituted an amendment to the Farmout Agreement and JOA but only with respect to the Caducity Proceedings and that those agreements were to remain in full force and effect "except as specifically provided" in the Letter Agreement.[15] In addition, the Letter Agreement provided that the "agreements [made in paragraph 2] with respect to the Caducity Proceedings" were to apply "notwithstanding any provision to the contrary" in the Farmout Agreement and JOA.[16]

26.     Paragraph 2 provided as follows:

> Notwithstanding any provision to the contrary in the Farmout Agreement executed on 19 October 2000 (the "Farmout Agreement") between OEPC and the Company, or the Operating Agreement executed on 31 October 2000 (the "Operating Agreement") between OEPC and the Company, the Company and OEPC hereby make the following agreements with respect to the Caducity Proceedings:
>
> > *(a)*     Neither the Company nor OEPC shall make any claim against the other for liability or fault in connection with the Caducity Proceedings or the fact that the Transfer has occurred and the Company and OEPC
> >
> > hereby specifically release each other from any and all such claims

---

[14] JX3, Letter Agreement.

[15] *Id.*, ¶ 4.

[16] *Id.*, ¶ 2.

and liability;

(b) The Company agrees that OEPC, as the sole counterparty to Petroecuador in the Block 15 Participation Contract, shall have the sole right to respond to the Caducity Proceedings, including without limitation the right to negotiate with the Ecuadorian Government, to protect its Participation Contract for Block 15 and all interests and assets associated with Block 15 operations and to initiate any legal proceedings related to the Caducity Proceedings; provided however, that OEPC shall continue to consult with the Company with respect to such matters and to keep the Company promptly apprised of all significant developments in the Caducity Proceedings;

(c) The Company agrees to fully cooperate with OEPC in (i) any actions taken by OEPC relating to the Caducity Proceedings, including any negotiations or attempts to resolve the Caducity Proceedings with the Government of Ecuador (ii) any endeavors by OEPC to protect its Participation Contract for Block 15 and all interests and assets associated with Block 15 operations and (iii) OEPC's pursuit of any legal remedies in the event that the Government of Ecuador acts to terminate OEPC's Participation Contract for Block 15 or to take any other action against OEPC as a result of the Caducity Proceedings;

(d) The Company agrees to continue to reimburse (or pay in accordance with existing cash call procedures under the Operating Agreement) OEPC for 40% of all reasonable costs and expenses associated in any way with the Caducity Proceedings or any actions taken by OEPC related to (b) and/or (c) (i), (ii) or (iii) above. Specifically, the Company agrees to reimburse (or pay in accordance with existing cash call procedures under the Operating Agreement) OEPC for 40% of all costs and expenses of:

  i. any penalty or fine related to the Caducity Proceedings;

  ii. any payments called for by any agreement(s) executed by OEPC with the Government of Ecuador or any department, agency or instrumentality thereof (including without limitation, Petroecuador or the Attorney General or the Minister of Energy and Mines acting on behalf of the Government of Ecuador) in order to resolve the Caducity Proceedings without termination of the Block 1 5 Participation Contract;

  iii. any pursuit of legal remedies related to the Caducity Proceedings; and

<blockquote>

<blockquote>

*iv.* any other reasonable costs and expenses incurred by OEPC in any way related to the Caducity Proceedings.

</blockquote>

*(e)* The Company hereby agrees that as part of an agreement to resolve the Caducity Proceedings without termination of the Block 15 Participation Contract, OEPC shall have the unilateral right to agree to amend the Block 15 Participation Contract to include some or all of the payments contemplated in paragraph (d)ii) above and to include a price sharing mechanism substantially similar to the price sharing mechanism contained in paragraph 8.1 of the Tarapoa Block Participation Contract (without the related marker price inflation adjustment), to which the Company is a party;

*(f)* OEPC agrees that (unless OEPC and the Company agree otherwise in writing) the Company shall not be obligated to hear the cost of any penalty, payment or amendment of the Block 15 Participation Contract agreed to by OEPC to resolve the Caducity Proceedings except to the extent that such cost is borne by both OEPC and the Company in proportion to their respective economic interests of 60% (OEPC): 40% (the Company); the Company agrees that any cost pursuant to paragraphs (d)i) or (d)ii) above that is so borne shall be deemed "reasonable" for purposes of this letter.

*(g)* If OEPC receives any monetary award from the Government of Ecuador as a result of the Government's actions to enforce caducity and terminate OEPC's contract with respect to Block 15, OEPC agrees that the Company is entitled to a 40% share in the net amount received, after all costs and expenses of the Caducity Proceedings have been reimbursed or paid (in calculating such amount there shall be no double counting).

</blockquote>

27.     The Letter Agreement contained several provisions that are central to the present dispute. First, in paragraph 2(a) the Parties agreed not to "make any claim against the other for liability or fault in connection with the Caducity Proceedings or the fact that the Transfer has occurred and . . . hereby specifically release each other from any and all such claims and liability." [17]

28.     Second, in paragraph 2(b) Andes agreed that OEPC, as the sole counterparty to the Participation Contract, "shall have the sole right to respond to the Caducity Proceedings,

---

[17] *Id.*, ¶ 2(a).

including the sole right to negotiate with the Ecuadorian Government . . . and to initiate any legal proceedings related to the Caducity Proceedings. . . ."[18]

29.     Third, in paragraph 2(c) the Parties agreed to cooperate concerning the *Caducidad* Proceedings and the possibility of a *Caducidad* Decree as well as the prosecution of any rights of recourse against Ecuador should the Participation Contract be terminated.[19]

30.     Fourth, in paragraph 2(d) Andes agreed to "continue to reimburse (or pay in accordance with existing cash call procedures under the Operating Agreement) Occidental for 40% of all reasonable costs and expenses associated in any way with the Caducity Proceedings. . . ."[20] It specified that such costs and expenses were to include "any penalty or fine related to the Caducity Proceedings. . . ."[21]

31.     Fifth, in paragraph 2(f) the Parties agreed that Andes would not be obligated to bear the cost of any "penalty, payment, or amendment of the Block 15 Participation Contract agreed to by OEPC to resolve the Caducity Proceedings" except to the extent that such cost was borne by both Parties in proportion to their respective economic interests of 60% for OEPC and 40% for Andes and that "any cost pursuant to paragraphs 2(d)(i) or (d)(ii) shall be deemed 'reasonable' for the purposes of this letter."[22]

32.     Finally, in paragraph 2(g) the Parties agreed that "[i]f Occidental receives any monetary award from the Government of Ecuador as a result of the Government's actions to enforce caducity and terminate Occidental's contract with regard to Block 15, Occidental agrees that the Company [Andes]is entitled to a 40% share in the net amount received, after all costs and expenses of the Caducity Proceedings have been reimbursed or paid (in calculating such amount there shall be no

---

18 *Id.*, ¶ 2(b).

19 *Id.*, ¶ 2(c).

20 *Id.*, ¶ 2(d).

21 *Id.*, ¶ 2(d)(i).

22 *Id.*, ¶ 2(f).

double counting."[23]

## B. Occidental-Ecuador ICSID Arbitration and ICSID Award

33.     On May 15, 2006, the Ecuadorian Minister of Energy and Mines issued the threatened *Caducidad* Decree, terminating the Participation Contract with immediate effect. Over the ensuing days, the Ecuadorian authorities seized Block 15 and its associated assets.

34.     On May 17, 2006, OEPC and its parent company OPC filed a Request for Arbitration against Ecuador before the International Centre for the Settlement of Investment Disputes ("**ICSID**") alleging that the *Caducidad* Decree was in breach of the Ecuador-US Bilateral Investment Treaty (the "**BIT**"). The case was styled *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11 (the "**ICSID Arbitration**"). OEPC claimed compensation for losses equal to 100% of the fair market value of the Participation Contract as of the date of caducity.

35.     Consistent with paragraphs 2(c) and (d) of the Letter Agreement, Andes did not participate as a party in the ICSID Arbitration but provided support in various forms, including but not limited to reimbursing OEPC for 40% of all reasonable costs and expenses incurred in relation to the *Caducidad* Proceedings (including the ICSID Arbitration), which amounted to $9,946,705.93. In accordance with paragraph 2(g) of the Letter Agreement, if OEPC "receive[d] any monetary award" in the ICSID Arbitration, OEPC would be entitled to a 40% share in the net amount received.

36.     In March 2009, Ecuador began raising the objection that OEPC could not recover damages for its full 100% Participating Interest in Block 15 because it had alienated a 40% economic interest by transfer to Andes (as it became) through the Farmout Agreement. OEPC disagreed on the basis that, notwithstanding the disputed transfer of a 40% economic interest, OEPC was and at all times remained the sole party to the Participation Contract and had standing to recover the full 100% value of that contract.

---

[23] *Id.*, ¶ 2(g).

37.     On October 5, 2012, the ICSID Tribunal issued its final award (the "**ICSID Award**").[24] The ICSID Tribunal held that although OEPC should have obtained Government approval before transferring a farmout interest in Block 15 to Andes, Ecuador's *Caducidad* Decree was not a proportionate or appropriate measure and, as such, was in breach of Ecuadorian and customary international law and was tantamount to expropriation for purposes of the Ecuador-US BIT. The Tribunal found that the market value of Block 15 as of May 2006, the date of the seizure, was $2,359,500,000. The Tribunal reduced the damages by 25%, however, to account for OEPC's contributory fault in failing to obtain Ecuador's consent to the transfer anticipated in the Farmout Agreement. In particular, the ICSID Tribunal found that:

> [A]s a result of their material and significant wrongful act, the Claimants [OPC and OEPC] have contributed to the extent of 25% to the prejudice which they suffered when the Respondent [Ecuador] issued the *Caducidad* Decree. The resulting apportionment of responsibility as between the Claimants and the Respondent, to wit 25% and 75%, is fair and reasonable in the circumstances of the present case.[25]

It further found:

> OEPC breached Clause 16.1 of the Participation Contract by failing to secure the required ministerial authorization for the transfer of rights under the Farmout Agreement; as a result of this breach, the damages awarded to the Claimants will be reduced by a factor of 25%….[26]

38.     Factoring in this reduction, the ICSID Tribunal, by majority, held that Ecuador was liable to OEPC (and its parent) for damages totaling $1,769,625,000 (plus interest).[27] The majority of the Tribunal specifically held that OEPC was entitled to recover on the basis of its 100% ownership interest in the rights under the Participation Contract.

39.     In a dissent, the third arbitrator stated that she disagreed with the majority's conclusion regarding the legal effect of OEPC's attempt to transfer an interest in Block 15 to Andes, which in her view had several consequences, including that the Tribunal could only have granted 60% of

---

[24] JX5, ICSID Award, October 5, 2012.

[25] *Id.*, ¶ 687.

[26] *Id.*, ¶ 876(iv).

[27] *Id.*, ¶ 876(v).

the damages to OEPC, in conformity with the applicable principles of international law.[28]

### C. ICSID Annulment Decision and Final ICSID Award

40.     On October 9, 2012, Ecuador filed an application for annulment of the ICSID Award pursuant to Articles 52 and 53 of the ICSID Convention. Ecuador's grounds for annulment included, *inter alia*, that the Tribunal had wrongly assumed jurisdiction over a 40% share of OEPC's investment, because under the Farmout Agreement and JOA that share belonged to Andes, an investor not protected by the Ecuador-US BIT.

41.     On November 2, 2015, an ICSID *ad hoc* Committee on Annulment (the "**ICSID Annulment Committee**") issued its decision (the "**ICSID Annulment Decision**"),[29] in which it found that the ICSID Tribunal had manifestly exceeded its powers by compensating OEPC for 100% of its investment in Block 15 when 40% of that investment belonged beneficially to Andes as a consequence of the Farmout Agreement and JOA.  The Annulment Committee dealt with this objection in terms of OEPC's lack of "standing" to claim for the 40% economic interest held by Andes.[30]

42.     Accordingly, the Annulment Committee partially annulled the ICSID Award, which resulted in the "**Final ICSID Award**"[31] under which OEPC's (and its parent's) damages were reduced by 40%, to $1,061,775,000 (plus interest).[32]

43.     The ICSID Annulment Committee offered a "final caveat" stating that its decision was not intended to "imply that investors holding beneficial ownership are left unprotected from interferences by host States."[33] The Committee stated that "[s]uch investors will enjoy the protection granted under the treaties which benefit their nationality. In the present case, AEC/Andes are entitled to the protection which investors from Bermuda/China enjoy, when

---

[28] *Id., Dissenting Opinion*, ¶¶ 117-168.

[29] JX6, ICSID Annulment Decision, November 2, 2015.

[30] *Id.*, ¶¶ 206-72.

[31] *Id.*, ¶ 590.

[32] *Id.*, ¶ 586.

[33] *Id.*, ¶ 272.

investing in Ecuador, under applicable bilateral investment treaties or under general principles of international law."[34]

### D.  Occidental-Ecuador Settlement Agreement

44.     On January 7, 2016, Occidental entered into a settlement agreement with Ecuador (the "**Settlement Agreement**").[35] Under that Agreement, in exchange for a release from all liability under the Final ICSID Award, Ecuador was to pay Occidental $979,699,368 (the "**Settlement Amount**"). The Settlement Amount was 30% less than the face value of the Final ICSID Award ($1,061,775,000) plus accrued interest.

45.     Further, in the Settlement Agreement Ecuador undertook to "satisfy" all "**Tax and Labor Amounts**" alleged to be owed by OEPC relating to tax, labor and other claims against OEPC as the Operator, arising out of the Participation Contract for Block 15.  The Settlement Agreement stated that these amounts totaled approximately $180 million (the "**Tax and Labor Liabilities**").[36]

46.     Occidental directed Ecuador to pay the Settlement Amount ($979,699,368) into OPC's bank account. Thus, although the ownership rights in Block 15 under the Participation Contract were valued by the ICSID Tribunal at $2,359,500,000, Occidental was able only to recover substantially less than half of that sum because of (1) the 25% reduction made by the ICSID Tribunal in light of OEPC's contributory fault; (2) the 40% reduction made by the ICSID Annulment Committee due to Occidental's lack of standing to assert Andes' 40% economic interest; and (3) the 30% reduction accepted by Occidental in the Settlement Agreement.

### E.  The Andes-OEPC Arbitration and Final Award

47.     On February 23, 2016, invoking paragraph 2(g) of the Letter Agreement, Andes made a written demand on OEPC for payment of 40% of the amount received from Ecuador.[37] By letter

---

[34] *Ibid.*

[35] JX4, Settlement Agreement between Occidental and Ecuador, January 7, 2016,

[36] *Id.*, Article 1.4.

[37] JX7**,** Andes-OEPC Final Award, March 26, 2021, ¶ 34.

dated March 4, 2016, OEPC denied liability for the amount claimed and instead offered to refund Andes' portion of the legal costs and expenses paid towards the ICSID Arbitration ($ 9,946,705.93).[38] As the Andes-OEPC Tribunal later observed, OEPC's response left "Andes with the impression that the Letter Agreement was to be treated as a nullity."[39]

48.     By a Notice of Arbitration dated July 10, 2017, Andes commenced an arbitration against OEPC before the American Arbitration Association. The case was styled *Andes Petroleum Ecuador Ltd. v. Occidental Exploration and Production Company,* ICDR Case No. 01-17-004-0048, and was administered by the International Centre for Dispute Resolution. Andes alleged that OEPC had breached its obligations under paragraph 2(g) of the Letter Agreement, which reads, "[i]f OEPC receives any monetary award from the Government of Ecuador as a result of the Government's actions to enforce caducity and terminate OEPC's contract with respect to Block 15, OEPC agrees that [Andes] is entitled to a 40% share in the net amount received, after all costs and expenses of the Caducity Proceedings have been reimbursed or paid (in calculating such amount there shall be no double counting." [40] Andes argued that it was entitled to recover as damages an amount equal to 40% of the Final ICSID Award, plus pre- and post-award interest.

49.     In response, OEPC denied liability, arguing, first, that Andes' entitlement to 40% of the "monetary award from the Government of Ecuador" under paragraph 2(g) of the Letter Agreement was contingent upon OEPC's recovery of 100% on the value of Block 15. Second, it argued that OEPC's standing to claim 100% of Block 15 interests was an implied condition under paragraph 2(g) of the Letter Agreement. Third, it contended that Andes was precluded from recovery because it had breached paragraph 2(c) of the Letter Agreement, as well as the implied duty of good faith and fair dealing, by failing to cause its shareholders to bring a claim against Ecuador under the China-Ecuador BIT. [41] Fourth, alternatively, it contended that the Letter Agreement must be rescinded because: (1) the Final ICSID Award frustrated the purpose of the

---

[38] *Ibid.*

[39] *Id.*, ¶ 206.

[40] JX3, Letter Agreement, ¶ 2(g).

[41] *Id.*, ¶ 146.

Letter Agreement; and (2) Andes and OEPC were mutually mistaken that OEPC had standing to recover in the ICSID Arbitration for 100% of the value of Block 15.[42]

50.     As to quantum, OEPC argued, first, that Andes should receive no damages because it had failed to mitigate its losses in that it had not caused its parent companies to pursue an investment treaty claim against Ecuador.[43] Second, alternatively, it argued that even if Andes were found to be entitled to recovery pursuant to paragraph 2(g) of the Letter Agreement, Andes should receive "a 40% share in the net amount received,"[44] i.e., a 40% portion of the Settlement Amount, not the Final ICSID Award.[45] In addition, it argued that Andes' recovery should be reduced to reflect: (1) alleged commercial benefits Andes obtained from Ecuador, [46] and/or (2) benefits OEPC indirectly conferred on Andes through the settlement of the Tax and Labor Liabilities in the Settlement Agreement.[47]

51.     OEPC did not contend that Andes' recovery should be reduced, or assert any counterclaim for damages, on the basis of any of the claims it asserts in this Arbitration. Specifically, OEPC did not claim that it was entitled to be reimbursed or indemnified by Andes for 40% of the alleged losses, costs, expenses or liabilities OEPC incurred as a result of the 25% contributory fault reduction or the 30% settlement reduction.

52.     In its Final Award, issued on March 26, 2021 (the "**Andes-OEPC Final Award**"), the Andes-OEPC Tribunal described the dispute as concerning "whether Andes is entitled, pursuant to the Letter Agreement, to recover from Occidental 40% of the Final ICSID Award Damages, 40%

---

[42] *Id.*, ¶ 147.

[43] *Id.*, ¶ 148.

[44] JX3, Letter Agreement, ¶ 2(g).

[45] JX7, Andes-OEPC Final Award, ¶ 334.

[46] *Id.,* ¶ 325.

[47] *Id.*, ¶ 329.

of the Settlement Agreement amount, some other amount or nothing at all."[48]

53.　　In the Andes-OPEC Final Award, the Andes-OEPC Tribunal decided that:

> For the foregoing reasons, as its FINAL AWARD, the Tribunal ORDERS and AWARDS that:
>
> a) Occidental's refusal to pay Andes 40% of the Settlement Amount recovered from the Government of Ecuador as a consequence of the ICSID Arbitration was a breach of paragraph 2(g) of the Letter Agreement;
>
> b) Occidental's defenses to liability for payment are denied in their entirety and with prejudice;
>
> c) Andes is entitled to payment by Occidental of a 40% share of the Settlement Amount of US$ 979,699,368 as defined in the Settlement Agreement, i.e., Andes is entitled to payment of US$ 391,879,747, and in addition thereto:
>
> > i) Andes is entitled to payment by Occidental of interest on the foregoing principal sum of US$ 391,879,747, at the rate set out in clause 3(i) of Exhibit H of the Farmout Agreement and paragraph 1.4 of the JOA— i.e., at the U.S. 1-month LIBOR rate plus 5%, compounded on a monthly basis—running from March 4, 2016 until the date of payment; and
> >
> > ii) Andes is entitled to reimbursement by Occidental of its share of the Arbitration Costs set out in paragraph 346 above in the sum of US$ 557,517.97 with interest on such sum accruing at 9% per annum from the date of this Award until the date of payment;
>
> d) Occidental shall pay the total amount set out in sub-paragraph 347(c) above into the Escrow Account referred to in the Andes/Encana September 20 Joint Letter, the account details for which are to be provided by Andes to Occidental forthwith, within thirty (30) calendar days of receipt of the Escrow Account details, and such payment once made will be in full and final satisfaction of Occidental's obligations under this Award and on the basis that receipt of such payment constitutes a release of claims by Andes and Encana as provided for in the September 20 Joint Letter;
>
> e) All other claims and defenses not otherwise addressed in this paragraph, including but not limited to the Parties' claims for recovery of attorneys' fees and expenses, are denied with prejudice.[49]

---

[48] JX7, Andes-OEPC Final Award, ¶ 150.

[49] JX7, Andes-OEPC Final Award, ¶ 347.

54.     The Andes-OEPC Tribunal concluded that Andes was "*entitled to a 40% share in the net amount received*" as provided in paragraph 2(g),"[50] which it held was the Settlement Amount ($979,699,368) rather than the face value of the Final ICSID Award ($1,061,775,000).[51] The Tribunal calculated Andes' share to be $391,879,747.[52]

55.     The Andes-OEPC Tribunal also considered OEPC's defenses to liability and its entitlement to offsets that would reduce Andes' recovery. First, it addressed OEPC's defenses based on the argument that Andes was obligated to take steps to recover its own 40% interest in Block 15 from Ecuador. OEPC raised this defense in the context of mitigation of damages as well as a defense to liability premised on paragraphs 2(c) and 3 of the Letter Agreement and as a breach of the implied duty of good faith and fair dealing. The Tribunal rejected these defenses, holding, *inter alia*, that Andes had no obligation to pursue Ecuador for recovery or to cause its shareholders to do so.[53]

56.     Second, the Andes-OEPC Tribunal considered OEPC's contention that any damages awarded to Andes should be offset by other compensation or commercial benefits that Andes allegedly received. Among other things, OEPC argued that Andes was seeking a "windfall" by failing to give OEPC credit for the more than $96 million in releases from the Tax and Labor liabilities it allegedly received from the Settlement Agreement.[54] OEPC argued that the amount of the releases should be deducted from the payment to be made pursuant to paragraph 2(g) of the Letter Agreement. The Tribunal rejected this claim, noting that Ecuador undertook to direct its agencies to terminate the tax and labor and other proceedings brought against OEPC. Accordingly, the Tribunal concluded that there was no "monetary award" received from Ecuador that would entitle OEPC to take this amount into account as a "credit" against its Letter Agreement obligations. In sum, the Tribunal found that none of the "credits" alleged by OEPC required making

---

[50] *Id.*, ¶ 335 (emphasis in original).

[51] *Id.*, ¶¶ 335-37.

[52] *Id.*, ¶ 337.

[53] *Id.*, ¶¶ 238-39, 250-55.

[54] *Id.*, ¶ 329.

any deductions from, or off-setting any amounts against, the damages owed to Andes for non-payment under paragraph 2(g) of the Letter Agreement.[55]

57.     The Andes-OEPC Final Award stated that "it is a final decision on the merits of all claims submitted to the Tribunal" and "[a]ll other requests of which a ruling is sought and which are not expressly granted herein, are denied."[56]

58.     The Andes-OEPC Final Award directed OEPC to make payment within thirty days of receiving payment instructions. Andes provided those instructions to OEPC on the date of the Final Award.[57] On April 23, 2021, Andes sent a letter to OEPC seeking confirmation of payment of the Final Award.[58]

59.     On April 26, 2021, OEPC responded by advising that it would be filing a petition to vacate and refuse recognition of the Andes-OEPC Final Award under the New York Convention and the Federal Arbitration Act.[59] In addition, OEPC stated that it would send Andes an invoice for the sum of $340,983,000 that represented Andes' 40% share of losses, costs, expenses and liabilities that OEPC incurred as Operator in Joint Operations and that Andes was obligated to pay under the Farmout Agreement and JOA.[60]

60.     On April 27, 2021, OEPC sent Andes a cash call for estimated April 2021 Joint Operation expenditures in the amount of $340,983,000.[61]

61.     By letter dated May 24, 2021, OEPC demanded payment of $340,983,000 from Andes for the April 2021 expenditures.[62]

---

[55] *Id.*, ¶ 322.

[56] *Id.*, ¶ 348.

[57] *Id.*, ¶ 347

[58] Ex. R-12, Letter from Andes to OEPC, April 23, 2021.

[59] Exs. R-50, R-51, R-52, Letter from OEPC to Andes, April 26, 2021; Ex. C62.

[60] *Ibid.*

[61] Ex. C-62, Emails from Karen E. Lippe of OEPC to Andes, April 27, 2021.

[62] R-14, Letter from OEPC to Andes, May 24, 2021.

62.     On November 1, 2021, OEPC filed its Demand for Arbitration in this proceeding, claiming that Andes owed $309,518,463.14 in losses, costs and expenses under the Letter Agreement, JOA and Farmout Agreement.

### F.  Confirmation Proceedings and Entry of Judgment

63.     On May 3, 2021, Andes filed a petition to confirm the Andes-OEPC Final Award in the United States District Court for the Southern District of New York (the "**Confirmation Proceedings**").[63] On June 24, 2021, OEPC filed a motion to vacate the Andes-OEPC Final Award on the grounds that the arbitrator appointed by OEPC had allegedly concealed a material relationship with Andes' lead counsel from the BonelliErede law firm in that, contemporaneously with the Andes-OEPC Arbitration, the two had served together as arbitrators on a panel in a separate and unrelated matter.

64.     On November 15, 2021, United States District Court Judge Alvin K. Hellerstein granted Andes' petition to confirm the Andes-OEPC Final Award in all respects and denied OEPC's motion to vacate.[64] The Court rejected OEPC's claims of "evident partiality" by the OEPC-appointed arbitrator. On December 2, 2021, it entered final judgment in favor of Andes and against OEPC in the amount of $558,577,380.56 plus costs and post-judgment interest (the "**Final Judgment**").[65]

65.     On December 14, 2021, OEPC appealed the Final Judgment to the United States Court of Appeals for the Second Circuit. On June 15, 2023, the Second Circuit issued a Summary Order, first, affirming the District Court judgment with regard to the issue of arbitrator impartiality and, second, vacating the judgment with regard to the calculation of pre-award interest and remanding that issue to the District Court for further consideration (the "**Second Circuit Summary**

---

[63] *See Andes Petroleum Ecuador Ltd. v. Occidental Exploration and Production Company*, No. 21-cv-03930-AKH (S.D.N.Y.), ECF No. 41.

[64] R-2, *Andes Petroleum Ecuador Ltd. v. Occidental Exploration and Production Company*, 1:21-cv-03930-AKH, (S.D.N.Y.), Opinion and Order, November 15, 2021.

[65] Ex. R-16, *Andes Petroleum Ecuador Ltd. v. Occidental Exploration and Production Company*, 1:21-cv-03930-AKH, (S.D.N.Y), Final Judgment, December 2, 2021.

**Order").[66]**

## III.   PROCEDURAL HISTORY

66.     Claimant OEPC commenced this Arbitration by filing a Demand for Arbitration dated November 1, 2021. OEPC alleged that Respondent Andes had breached its obligations under the Letter Agreement, the Farmout Agreement, and the JOA by failing to pay its 40% share of losses, costs, and expenses incurred by OEPC as Operator in relation to the Caducity Proceedings and Joint Operations.

67.     Specifically, OEPC contended that Andes was liable to reimburse and indemnify OEPC for losses it suffered as a result of the ICSID Tribunal's decision, based on its finding that OEPC was contributorily at fault, to reduce by 25% the damages awarded for the expropriation of Block 15. In addition, it contended that Andes was liable to reimburse and indemnify OEPC for losses it suffered when OEPC entered into the Settlement Agreement with Ecuador and received a settlement payment that was 30% less than the face amount of the ICSID Final Award plus interest.

68.     Andes filed an Answer to the Demand dated November 18, 2021. It denied any liability and asserted affirmative defenses, including on the basis of the doctrines of res judicata and collateral estoppel.

69.     OEPC appointed Jesse R. Pierce, Esq. as arbitrator, and Andes appointed Lucy F. Reed, Esq. as arbitrator. These appointments were confirmed on January 27, 2022. Upon nomination of the co-arbitrators, John J. Buckley, Jr., Esq. was appointed Chairperson on April 6, 2022, and the Tribunal was constituted as of that date.

70.     On April 20, 2022, Andes submitted by letter an Application for Leave to File a Dispositive Motion (the "**Application for Leave**") pursuant to AAA Commercial Arbitration Rule R-33 to dismiss OEPC's claims. Andes' letter attached a copy of the Dispositive Motion, which contended that OEPC's claims were barred by the doctrines of res judicata and collateral estoppel

---

[66] Ex.R-79, *Andes Petroleum Ecuador Ltd v Occidental Exploration and Production Company*, No. 21-3039-cv, Summary Order, June 15, 2023.

as a result of the prior Andes-OEPC Arbitration and the resulting Andes-OEPC Final Award.

71.     On April 27, 2022, OEPC submitted a letter opposing Andes' Application for Leave.

72.     Also on April 27, 2022, the Tribunal held a Preliminary Hearing via videoconference to discuss the management and scheduling of the proceeding. In addition, the Tribunal heard argument from the Parties regarding Andes' Application for Leave.

73.     On April 29, 2022, Andes submitted a Reply in support of its Application for Leave.

74.     On May 3, 2022, having read and considered the contents of Andes' Dispositive Motion, along with the Parties' other related submissions and arguments, the Tribunal notified the Parties by email that it had decided by majority to deny Andes' Application for Leave, stating that it did so for reasons of efficiency and cost-effectiveness. The Tribunal noted that its decision was not to be interpreted as expressing any view on Andes' likelihood of success on its objection to the admissibility of OEPC's claims. Later, in Procedural Order No. 10 ("**PO10**") on February 27, 2023, the Tribunal formalized its decision of May 3, 2022 and indicated that in its Final Award it would address and rule on the merits of Andes' defenses in light of the entire record, including on the basis of the evidentiary hearing scheduled for December 12-14, 2022, and with the benefit of the Parties' additional oral and written submissions.

75.     On May 17, 2022, the Tribunal issued Procedural Order No. 1 ("**PO1**"), which, *inter alia,* set forth the procedures that would govern the arbitration proceedings and established a Procedural Timetable in Appendix 1.

76.     On May 17, 2022, Andes filed an Application for Security for Costs.

77.     On May 27, 2022, OEPC submitted a letter responding to and opposing Andes' Application for Security for Costs.

78.     On June 8, 2022, OEPC filed its Statement of Claims (the "**SOC**"), together with documentary evidence, legal authorities, the fact witness statements of Marcia E. Backus, Gerald Ellis, and Karen Lippe, and the Expert Report of Professor Keith Hall. In Count One, it contended that Andes was liable to reimburse and indemnify OEPC for 40% of the losses it suffered as a

result of the ICSID Tribunal's decision, based on its finding that OEPC was contributorily at fault, to reduce by 25% the damages awarded for the expropriation of Block 15. OEPC alleged that the total reduction was $353,925,000, of which $141,570,000 represented Andes' 40% share. It contended that this loss was both a "penalty" and a "cost and expense" under the Letter Agreement.

79.     In Count Two, OEPC contended that Andes was liable to reimburse and indemnify OEPC for 40% of the losses it suffered as a result of Occidental's entering into the Settlement Agreement and accepting a settlement amount that was 30% less than the amount of the Final ICSID Award plus interest. It alleged that the 30% reduction amounted to $419,871,157.86, of which $167,948,463.14 represented Andes' 40 % share. It contended that Andes was liable for this amount under both the Letter Agreement and the JOA.

80.     The SOC also contained a new "Count Three" for "Breach of JOA Conflicts and Farmout Disclosure" that did not appear in its Demand for Arbitration dated November 1, 2021. Furthermore, it included a prayer for relief, not found in the Demand for Arbitration, for an award of arbitration fees resulting from Andes' alleged breach of the contracts' disclosure and confidentiality requirements on the basis of the new Count Three.

81.     On June 17, 2022, OEPC filed an Opposition to Andes' Application for Security for Costs.

82.     On June 27, 2022, Andes filed a Reply in support of its Application for Security for Costs.

83.     On July 6, 2022, the Tribunal held a hearing via videoconference for the Parties to present argument on Andes' Application for Security for Costs.

84.     On July 13, 2022, Respondent Andes filed its Statement of Defense (the "**SOD**"), together with documentary evidence, legal authorities, and the Expert Report of A. Timothy Martin. Andes objected to OEPC's inclusion of Count Three in the SOC on the ground that it was a new claim and was not pleaded in its Demand for Arbitration, that it was added without the consent of the Tribunal after it had been constituted, and that it was therefore in violation of the AAA Rules. Although Andes requested that the Tribunal strike the new count and related paragraphs, it did not file an application for such relief.

85.     On July 25, 2022, the Parties advised the Tribunal that they had reached an agreement,

subject to the entry of an agreed order by the Tribunal, that OEPC's indirect parent company, OPC, would fund (on OEPC's behalf) a cash deposit of $4.5 million for the limited purpose of serving as security (and providing funding) for an award of attorneys' fees and costs to Andes if the Tribunal were to order such relief in its Final Award.

86.     On July 28, 2022, pursuant to the joint request of the Parties, the Tribunal issued Procedural Order No. 2 ("**PO2**"), which amended the Procedural Timetable in Appendix 1 of PO1.

87.     On August 9, 2022, pursuant to the joint request of the Parties, the Tribunal issued Procedural Order No. 3 ("**PO3**") as an "Agreed Order." It provided for OEPC to deposit cash and security in the amount of $4.5 million for attorneys' fees and costs, to be held in escrow by the AAA pending the Final Award resolving the claims and defenses in the Arbitration. PO3 further provided that pursuant to Rule R-47 of the AAA Rules and the Parties' arbitration agreement, the Tribunal would address the disposition of the deposited funds in its Final Award. In issuing PO3, the Tribunal made no finding on the merits of Andes' Application for Security for Costs or the Parties' claims and defenses. The Parties provided a copy of an Escrow Agreement dated August 8, 2022 between OEPC and Andes, to be accepted by the AAA as escrow agent.

88.     On August 11, 2022, OEPC filed an Application to Compel Andes to Produce Live Witnesses at the evidentiary hearing (the "**Live Witness Application**").

89.     On August 15, 2022, the Tribunal issued Procedural Order No. 4 ("**PO4**"), which addressed the Parties' applications for production of documents dated August 8, 2022 and ordered the production of certain categories of requested documents. The Tribunal directed the Parties to produce all responsive documents that they had undertaken or been ordered to produce by August 29, 2022. The Tribunal further noted that Andes, in its Objections to Claimant's July 20, 2022 requests for production of documents, had contended that certain requests were improper because they related to Count Three of the SOC, which it maintained was a "new claim" not contained in OEPC's Demand for Arbitration and was precluded by the AAA Rules. Andes' Objections had asked the Tribunal to strike Count Three and all related paragraphs from the SOC. In response, OEPC had denied that Count Three was a new claim and contended that its existence had been disclosed in its Demand for Arbitration. To resolve this dispute, the Tribunal invited OEPC to submit a provisional application under Rule R-6(b) of the AAA Rules to add Count Three and

invited Andes to file an application to strike that count and related paragraphs from the SOC.

90.     On August 25, 2022, pursuant to the joint request of the Parties. the Tribunal issued Procedural Order No. 5 ("**PO5**"), which revised the Procedural Timetable in Appendix 1 to PO1.

91.     On September 2, 2022, Claimant filed its Statement of Reply, together with documentary evidence, legal authorities, and the Supplementary Expert Report of Professor Hall.

92.     On September 5, 2022, Andes filed an Opposition to OEPC's Live Witness Application.

93.     Also on September 5, 2022, Andes filed an Application to Strike Count Three, and OEPC filed an Application to affirm the inclusion of Count Three in the SOC or for leave to assert it (the "**Application for Leave to Assert Count Three**").

94.     On September 14, 2022, Andes filed a response to OEPC's Application for Leave to Assert Count Three. On the same date, OEPC filed a response to Andes' Application to Strike Count Three.

95.     Also on September 14, 2022, Andes' counsel wrote to the Tribunal to inform it that a document responsive to OEPC's Document Request No. 9 had recently come to its attention in the context of other ongoing legal proceedings. Andes had previously represented that no documents existed in response to this request. Andes provided a copy of this document with its September 14 letter. The document, later marked by OEPC as Exhibit C80, was titled "Meeting Minutes" and memorialized a meeting held on December 22, 2015 between Dr. Diego Garcia Carrión, then Ecuador's Attorney General, and Dr. Xiang Zhang, then Andes' President. The disclosure of Exhibit C80 precipitated the filing of several applications by OEPC as discussed below, and the document became the subject of Procedural Orders Nos. 7, 12 and 14.

96.     On September 15, 2022, the Tribunal held a hearing via videoconference during which the Parties presented arguments relating to OEPC's Live Witness Application, OEPC's Application for Leave to Assert Count Three, and Andes' Application to Strike Count Three.

97.     On September 22, 2022, OEPC filed an Application for Leave to Amend its Statement of Claim and Statement of Reply and an Application for Discovery Relief in light of the document

(Exhibit C80) disclosed by Andes on September 14, 2022.

98.     On September 27, 2022, Andes filed a Summary Response to OEPC's Applications for Leave to Amend its Statement of Claim and Statement of Reply and Application for Discovery Relief.

99.     On October 17, 2022, the Tribunal notified the Parties via email that it had decided to grant Andes' Application to Strike Count Three from the SOC and to deny Claimant's Application for Leave to Assert Count Three as a new claim and that a formal order would follow in due course. In Procedural Order No. 6 [Corrected] ("**PO6**") dated November 7, 2022, the Tribunal later stated the reasons for its October 17, 2022 decision.

100.    On October 21, 2022, Andes filed its Statement of Rejoinder, together with documentary evidence, legal authorities, and the Second Expert Report of Mr. Martin.

101.    On October 21, 2022, Andes also submitted a letter brief that, *inter alia*, further responded to OEPC's pending Applications. Attached to the letter was (1) a certification from Mr. Shuangjie Dai, Deputy Legal Manager at Andes, on the supplemental document collection undertaken by Andes (Annex 26), and (2) a letter dated October 20, 2022 from Ecuador's former Attorney General, Mr. Diego García Carrión, providing an account of the meeting memorialized in Exhibit C80 (Annex 25).

102.    On October 28, 2022, OEPC filed (1) a Motion to Strike Annex 25 (the letter dated October 20, 2022 from former Attorney General Garcia) to Respondent's Letter of October 21, 2022 and (2) an Omnibus Reply in support of its Live Witness Application and Applications for Leave to Amend Statements of Claim and Reply and for Discovery Relief. On November 14, 2022, the Tribunal held a hearing via videoconference on the various pending applications.

103.    On November 15, 2022, the Tribunal issued Procedural Order No. 7 ("**PO7**"), summarily denying OEPC's Live Witness Application, Motion to Strike Annex 25, and Applications for Leave to Amend Statements of Claim and Reply and for Discovery Relief. PO7 stated that the Tribunal's decision was without prejudice to OEPC's right to apply for leave to resubmit any or all of the applications at the conclusion of the evidentiary hearing to be held December 12-15, 2022.

104.    In PO7, the Tribunal also directed Andes to resubmit the letter dated October 20, 2022 from former Attorney General Garcia (Annex 25) in the form of a sworn witness statement and to confirm the availability of Mr. Garcia to testify via videoconference during the evidentiary hearing on December 12-15, 2022 in the event the Tribunal decided that it wanted to question him. The Tribunal further directed Andes to resubmit the letter dated October 20, 2022 from Shuangie Dai (Annex 26) in the form of a sworn statement. The Tribunal indicated that it would later issue an order stating the reasons for its denial of OEPC's Applications.

105.    On November 28, 2022, the Tribunal issued Procedural Order No. 8 ("**PO8"),** addressing procedural, administrative and logistical matters in preparation for the December 12-15, 2022 hearing. In PO8, the Tribunal requested the appearance of Mr. Ellis and Ms. Backus for examination at the hearing. In addition, it requested the appearance of Mr. Garcia via videoconference for examination at the hearing. The Tribunal also requested the appearance of OEPC's expert witness, Prof. Hall, and Andes' expert witness, Mr. Martin, for cross-examination at the hearing.

106.    On December 10, 2022, the Tribunal issued Procedural Order No. 9 ("**PO9**"), establishing procedures for conducting a virtual hearing via videoconference on December 12-15, 2022. The need to convert the in-person hearing to a virtual hearing arose from OEPC's lead counsel's testing positive for the Covid-19 virus.

107.    On December 12, 13 and 14, 2022, the Tribunal held a virtual hearing at which fact and expert witnesses testified and counsel presented oral argument. The Tribunal members sat together at the AAA's offices in New York City.

108.    On January 27, 2023, the Parties filed their Post-Hearing Briefs. On the same date, OEPC filed a Renewed Application for Leave to Amend Statements of Claim and Reply (the "**Renewed Application for Leave to Amend**"). On January 28, 2023, Andes sent an email to the Tribunal objecting to OEPC's Renewed Application for Leave to Amend as untimely and otherwise procedurally improper.

109.    On February 14, 2023, Andes filed an opposition to OEPC's Renewed Application for Leave to Amend.

110.     On February 28, 2023, the Tribunal issued Procedural Order No. 11 ("**PO11**"), stating the reasons for its decision in P07 denying OEPC's Live Witness Application.

111.     On February 28, 2023, the Tribunal also issued Procedural Order No. 12 ("**PO12**"), stating the reasons for its decisions in P07 denying OEPC's Application for Leave to Amend, Application for Discovery Relief, and Motion to Strike Annex 25. The Tribunal explained that the proposed amendment would add "new or different" claims within the meaning of Rule R-6(b) of the AAA Commercial Arbitration Rules and that the decision whether or not to allow them therefore fell solely within its discretion. The Tribunal provided several reasons for its decision to deny leave. First, the proposed amendment would introduce significant new factual and legal issues at a late stage of the proceeding and delay for some indeterminable period the evidentiary hearing already scheduled for December 2022 and the resolution of the dispute. It further stated:

> 19.    Second, it was the Tribunal's view that, as a matter of fundamental fairness, it was important that OEPC be able to demonstrate that it had a good faith basis, from a legal or factual standpoint, for asserting the new claims and that the proposed amendment was not a fishing expedition in search of a claim, a likely waste of the Parties' time and resources, or a vehicle for delay. Critically, the proposed amendment was based on the theory that Ex. C80 evidenced an extant agreement between Andes and Ecuador to the effect that Andes would be compensated for the loss of its 40% interest in Block 15 by being granted concessions in Blocks 79 and 83. The Tribunal carefully considered Ex. C80 and regarded it as falling far short of justifying that conclusion. The Meeting Minutes indicate that Dr. Zhang, then President of Andes, raised several topics with Mr. Garcia, then Ecuador's Attorney General, one of which was the prospect of Andes being compensated for its loss in the Block 15 arbitration.[10] Dr. Zhang suggested that "the Ecuadorian government resolve the series of issues including the tax dispute between Andes in the Ecuadorian government, remaining equity in Block 15, the return of the OPC Pipeline to the government, etc. in a package deal."[11] Mr. Garcia reportedly responded by suggesting "negotiation between Andes and the Ecuadorian government," and that if no consensus could be reached, these issues could be resolved by a proceeding in the district court in Quito.[12] Both parties expressed an unwillingness to go to arbitration; the Meeting Minutes, however, reflect neither an active negotiation at that time, nor an agreement to forgo arbitration in exchange for compensation, nor any resolution of the issues raised.

> 20.    Significantly, Ex. C80 nowhere mentions Blocks 79 and 83 or anywhere indicates that the parties discussed, much less negotiated, a side deal that Andes would be awarded concessions in these Blocks as compensation for its loss in Block 15 or for forgoing an arbitration against Ecuador. Rather, Ex. C80 shows that the

meeting ended inconclusively, with no specific plan going forward and Mr. Garcia's open-ended suggestion of either future negotiations between Andes and other unspecified Ecuadorian officials (apparently not him) and/or proceedings in the Quito district court. It does not indicate that any resolution or agreement was reached at the meeting.

---

[10] The Meeting Minutes also reflect Dr. Zhang stating that "when [then] Vice- President Jorge Glas of Ecuador visited China, he said that CUYABENO SASABARI would be used to compensate Andes for its losses in Block 15 arbitration." The minutes do not record any response from Mr. Garcia or reflect any further mention of this alleged statement.

[11] Ex. C80.

[12] *Id.*

21.     By itself, Ex. C80 is insufficient to show that OEPC had a good faith basis to allege a *quid pro quo* agreement whereby Andes agreed not to pursue an ICSID claim against Ecuador regarding Block 15 in exchange for being awarded concessions in Blocks 79 and 83. Ultimately, OEPC offered argument and speculation, not evidence.

22.     Moreover, in the Tribunal's view, the meaning of Ex. C80 had to be assessed, not in isolation, but in the context of all of the evidence in the record at that time it issued PO7. That included evidence that Andes presented in opposition to OEPC's Application. To refute OEPC's assertion that Ex. C80 should be read as evidencing a side deal, on October 21, 2022 OEPC submitted a letter dated October 20, 2022 from Mr. Garcia, stating that he never discussed, negotiated or approved an agreement between Ecuador and Andes to compensate Andes for its 40% interest in Block 15.[13] He stated that the December 15, 2015 meeting was one of a series of periodic meetings held to discuss issues facing Andes relating to the OPC pipeline and tax disputes such as the taxability of Carry Forward under the Andes' Service Contracts but not including Occidental's ICSID arbitration against Ecuador or any negotiation concerning compensating Andes for its interest in Block 15. [14] He further stated that Ecuador realized the possibility that Andes "might sue Ecuador for its 40% share in Block 15" but Ecuador's position was that "it had to defend itself from any such claim."[15] In his view, "in no circumstances would Ecuador have agreed to compensate Andes…."[16] He further stated that any conversation he had with Andes' representatives regarding Block 15 would not and did not in any way influence the negotiations the Ecuadorian state had with Occidental.[17] At the Tribunal's direction, Mr. Garcia later re-submitted his letter in the form of a sworn witness statement dated December 5, 2022.[18]

23.     Andes also noted that Ecuadorian law required that any agreement of the type alleged by OEPC would have had to be in the form of a formal settlement agreement which, if the amount exceeded $20,000, would have required the approval of the Attorney General, in this case Mr. Garcia. In his letter and later in his sworn statement, Mr. Garcia stated that he was never informed of such an arrangement and never approved any such deal. Andes contended that any deal concluded without the required authorization under Ecuadorian law would have been illegal.[19]

---

[13] See Respondent's Letter Brief and Annex 25 thereto. As stated below, Mr. Garcia later converted his letter into a sworn witness statement which, for convenience, we will cite rather than his original letter. *See* Witness Statement of Diego Garcia Carrión sworn December 5, 2022 ("Garcia Witness Statement"), ¶¶ 9-14.

[14] *Id*., ¶¶ 10-11.

[15] *Id*., ¶ 12.

[16] *Id*.

[17] *Id*., ¶¶ 15-17.

[18] Andes' counsel also obtained Mr. Garcia's agreement to be available to testify at the evidentiary hearing in December 2022 if the Tribunal so requested.  In PO8 dated November 28, 2022, the (cont…)

24.     The absence of actual proof of any side deal agreement was reinforced by the supplemental document collection and review process in September and October 2022 to determine whether Andes possessed any further documents (beyond Ex. C80) responsive to Request No. 9, which requested "any communications by Andes … with Ecuador … regarding or referring to Andes' 40% interest or any interests of Andes in Block 15" during the relevant periods. In originally objecting to this Request, Andes had represented that no responsive documents existed but later discovered Ex. C80 in the context of other ongoing litigation.[20] Andes' counsel promptly corrected the record by bringing Ex. C80 to the Tribunal's attention in a letter dated September 14, 2022 and thereafter Andes undertook its supplemental document search and verification process. On October 21, 2022, Andes' counsel submitted a Letter Brief to the Tribunal confirming that this process had not revealed any further responsive documents. Andes' letter was supported by a certification dated October 20, 2022 from Andes' Deputy Legal Manager, Shuangjie Dai, describing the steps taken by Andes during its supplemental document collection and review process. At the Tribunal's invitation, Mr. Dai later re-submitted his certification in the form of a sworn witness statement dated December 5, 2022. Again, Andes' extensive and reportedly thorough supplemental process did not uncover any additional documents to indicate that

---

Tribunal requested that Mr. Garcia appear for examination at the hearing via videoconference; he in fact testified remotely on December 13, 2022 and was cross-examined by OEPC. Thus, notwithstanding the denial of its Application for Leave to Amend in PO7, at the evidentiary hearing OEPC was allowed to develop a record to support an amendment alleging its "side deal" and "interference" theories, including by cross-examining Mr. Garcia. PO7 also stated that OEPC could seek leave to resubmit its Application for Leave to Amend after the conclusion of the evidentiary hearing, which it did in January 27, 2023 and that the Tribunal would address the Renewed Application for Leave to Amend in a separate order and discuss the import of the testimony of Mr. Garcia and OEPC's witness Ms. Marcia E. Backus, Senior Vice President and General Counsel of Occidental, in the Final Award.

[19] Respondent's Letter Brief, ¶¶ 39-40.

[20] In Procedural Order No. 4, the Tribunal had denied Request No. 9 as "moot on the grounds that Andes states that no responsive documents exist." With the exception of Exhibit C80, Andes still maintains its objection to this request but has conducted a further search for responsive documents, as explained above.

Andes discussed its interest in Block 15 with Ecuador after their December 22, 2015 meeting or had entered into the alleged side deal.

25.      Aside from relying on Ex. C80 to show a side deal, OEPC contended that the Service Contracts for Blocks 79 and 83 were compensation for Andes' loss of its interest in Block 15. In making this argument, it relied on the timing of the execution of the Service Contracts for Blocks 79 and 84 on January 25, 2016, which it contended was suspicious because the execution occurred only a month after the December 22, 2015 meeting. On that basis, OEPC argued that the Tribunal should infer that these two events were linked. In its Letter Brief of October 21, 2022, Andes addressed that argument, relying on exhibits (R-34 and R-35) that were part of the record in the prior Andes-OEPC Arbitration. These exhibits showed that the concessions for Blocks 79 and 83 were awarded by Ecuador on May 8, 2014, more than a year before the December 2015 Ex. C80 meeting and four years before Ecuador and Occidental entered into the settlement agreement, and dated back to Ecuador's XI Round Oil Tender, launched in 2012. Andes pointed out that the awards of the concessions in May 2014 legally obligated Ecuador to execute the Service Contracts and that the process took almost two years to complete because of delays in securing Andes' parent company guarantees.[21] In sum, OEPC did not present any evidence in support of its claim that the Service Contracts in Blocks 79 and 84 were linked to the December 22, 2015 Ex. C80 meeting or were made pursuant to any side deal agreement, despite the fact that showing the existence of such a linkage was critical to both OEPC's claim of a breach based on a side deal and its damages theory, which sought compensation based on the concessions for Blocks 79 and 83.

26.      Third, in the Andes-OEPC Arbitration, the tribunal found that OEPC had failed to show that Andes received commercial benefits from Ecuador, including the concessions in Blocks 79 and 83, as compensation for its loss in Block 15.[22] The Andes-OEPC Tribunal rejected OEPC's claim, concluding that "Occidental has not provided an evidentiary basis for tying any particular alleged 'benefit' to conduct in relation to recovery of Andes' 40% economic interest in Block 15 or obligations arising under the Letter Agreement."[23] It further stated:

> 327.          … Occidental has not identified a clear legal rationale for the relevance of any such benefit, even if a connection with recovery of Andes' 40% economic interest and/or Letter Agreement could be

---

[21] Respondent's Letter Brief, ¶¶ 28-34 and exhibits cited therein.

[22] OEPC had alleged that Andes received these commercial benefits in lieu of pursuing a claim against Ecuador. *See* JX7, Final Award ¶ 320. OEPC specifically cited the "two new Service Contracts for Blocks 79 and 83." *Id.*, ¶ 325.

[23] JX7, ¶ 327.

established. The bare allegation that Andes has *"already been made whole"* (Occ. PH Br., ¶ 81) is inadequate in this purpose.

\* \* \*

328.        … As to Andes' actions, Occidental has not tied any of the alleged *"benefits"* to any specific conduct that would be relevant to create a *"set off"* or to provide a basis for a *"mitigation"* defense to Occidental's obligation to make payments under the Letter Agreement. Accordingly, the Tribunal declines to make any deduction to the damages awarded.

27.        Thus, OEPC's proposed amendment, which is premised on an alleged side deal, is essentially a recycling of aclaim previously litigated between the Parties. Aside from whether the Andes-OEPC Final Award bars OEPC from asserting the proposed claims under the doctrines of res judicata and collateral estoppel (a question we do not now decide), the unfair prejudice to Andes from having to re-litigate the same issue is a factor that the Tribunal may and did consider in exercising its discretion not to permit the proposed amendment. We recognize, of course, that Andes did not produce the December 22, 2015 meeting minutes in the Andes-OEPC Arbitration and that the Andes-OEOC Tribunal did not have Exhibit C80 to consider in reaching its conclusions. Given our own assessment that Exhibit C80 does not constitute proof of the alleged side deal, however, we do not regard it as undermining the conclusions of the Andes/OEPC tribunal as set forth above.

Fourth, the Tribunal is also unpersuaded that there is a good faith basis for alleging a breach of fiduciary duty. The Parties' relationship was contractual in nature. The JOA expressly disclaimed a fiduciary relationship.[24]

---

[24] Given that the grounds cited above were sufficient to persuade the Tribunal that the Application for Leave to Amend should be denied, we found it unnecessary to address Andes' argument that the proposed claims are barred by the statute of limitations.

112.     On March 6, 2023, the Tribunal issued Procedural Order No. 13 ("**PO13**"), scheduling an in-person hearing on March 27, 2023 to allow the Parties to present closing arguments on the merits of the claims and defenses and on OEPC's Renewed Application for Leave.

113.     On March 27, 2023, the Tribunal held an in-person hearing at the AAA's offices in New York City during which the Parties presented closing arguments on the merits of their claims and defenses. The Parties also presented arguments on OEPC's Renewed Application for Leave to Amend.

114.     On May 4, 2023, the Tribunal issued Procedural Order No. 14 ("**PO14**"), which denied OEPC's Renewed Application for Leave to Amend. PO14 stated in relevant part:

> 38.     In reaching its decision, the Tribunal notes that OEPC was given an opportunity to develop evidence to support its proposed claims. Thus, in Document Request No. 8, OEPC sought:
>
>> Documents sufficient to show whether Andes relinquished or offered to relinquish either: a) its 40% economic interest in Block 15 or b) its claim against Ecuador for the value of that interest in exchange for some other commercial benefit.
>
> The Tribunal granted that request to the extent it sought documents relating to whether Andes used any such potential economic interest or claim against Ecuador for commercial benefit.[67]
>
> 39.     In Request No. 9, OEPC sought:
>
>> Documents reflecting any communications by Andes, or any person on Andes' behalf, including by its shareholders, Sinopec and CNPC, with Ecuador or any agent thereof, regarding or referring to Andes' 40% interest or any interest of Andes in Block 15 during a) the period from October 5, 2012, the date of the initial ICSID Award against Ecuador, JX5, through March 26, 2021, the date of the Andes Award, JX7; b) after November 2, 2015, the date of the Annulment Award, JX6; and/or c) from and after the date of the Ecuador settlement.

---

[67] *See* Procedural Order No. 4 ("**PO4**"), Appendix A, at Request No.8.

40.     Initially, the Tribunal denied this Request as moot on the ground that Andes represented that no responsive documents existed.[68] Subsequently, on September 14, 2022, Andes' counsel in this proceeding wrote to inform the Tribunal that a document responsive to OEPC's Request No. 9 had come to its attention after it had been identified the prior week in the context of other ongoing litigation proceedings.[69] Andes' provided a copy of that document to correct the record in light of its prior representation that no such responsive documents exited. That document was the Meeting Minutes of December 22, 2015 meeting between Andes and Ecuador, later marked as Ex. C80. Andes' counsel stated that it was in the process of verifying if other responsive documented existed.   On October 22, 2022, Andes' counsel submitted a letter brief informing the Tribunal of the outcome of the document collection-verification process regarding Request No 9, which did not reveal any additional responsive documents.  Andes stated that it collected from and reviewed the data from twelve custodians, eleven of whom had been identified by OEPC's parent company, Occidental Petroleum Corporation in the DCL Action as potentially relevant custodians. To collect the data, IT staff at Andes undertook a full collection of the email boxes and all other electronic documents maintained by each of the custodians. This process yielded a total of 1,109,746 documents after deduplication, which were uploaded to an eDiscovery software platform. Counsel for Andes then proceeded to apply the search terms suggested by OEPC in the DCL Action to the custodians that were employed by Andes during the relevant time period.  Separately, Andes' counsel applied search terms relevant to the arbitration to all custodians. Andes' counsel and external vendors (who had been trained and supervised by Andes' counsel) reviewed more than 150,000 documents.

41.     In addition, the Tribunal requested former Attorney General Garcia to submit a sworn witness statement about the matters in Ex. C80 and to make himself available via videoconference at the December 2022 hearing, which he did. OEPC's counsel thus had an opportunity cross-examine him regarding that meeting and his involvement in the settlement negotiations between OEPC and Ecuador. For these reasons, the Tribunal is satisfied that OEPC was given a reasonable opportunity to obtain documents relevant to the claims in its Renewed Application and examine Mr. Garcia on those topics. As explained in Procedural Order No. 11, although Mr. Garcia was not within its control, Andes arranged for him to appear to testify if the Tribunal so requested. In PO7 the Tribunal ordered Andes.

115.    On May 19, 2023, the Parties submitted Applications for Fees and Costs of the arbitration. OEPC's Application included, as Appendix B, an Expert Report from a retired federal district court

---

[68] *Id.*, at Request 9.

[69] Ex. C81, Letter dated September 4, 2022 from Herbert Smith Freehills to Members of the Tribunal. to confirm his availability to testify, and in PO8 the Tribunal requested that he appear. Mr. Garcia later testified via videoconference on December 13, 2022.

judge, the Hon. Shira Scheindlin, along with legal authorities marked CL153-CL159.

116. On May 27, 2023, Andes filed an Application to Strike Appendix B as an "Unsanctioned Report."

117. On May 31, 2023, the Parties submitted replies to the cost applications.

118. On June 2, 2023, OEPC filed a response to Andes' Application to Strike Appendix B.

119. On June 9, 2023, the Tribunal by majority issued Procedural Order No. 15 [Corrected via email on June 12, 2022] ("**PO15**"), granting Andes' Application to Strike Appendix B.

120. On June 16, 2023, Andes requested leave to submit as Exhibit R-79 a copy of the Second Circuit Summary Order of June 15, 2023. The Tribunal granted leave and admitted Exhibit R-79.

121. On June 20, 2023, the Tribunal declared the hearing closed pursuant to Rule R-39(b) of the AAA Rules.

## IV. PRINCIPAL CONTENTIONS OF THE PARTIES

### A. Claimant's Position

122. OEPC asserts two claims for breach of contract. First, it alleges that Andes breached the Letter Agreement, the JOA and the Farmout Agreement by failing to pay a 40% share of the costs and expenses that OEPC incurred when the ICSID Tribunal reduced by 25% the amount of damages to be awarded for Ecuador's expropriation of Block 15. The ICSID Tribunal made the reduction to account for OEPC's contributory fault in failing to obtain Ecuador's consent to the transfer of rights contemplated in the Farmout Agreement. Second, OEPC alleges that Andes breached those same agreements by failing to pay a 40% share of the costs and expenses that OEPC incurred when it entered into the Settlement Agreement and accepted a Settlement Amount that reflected a 30% reduction or discount as compared to the face amount of the Final ICSID Award plus interest. For each claim, OEPC contends that Andes is obligated to pay, reimburse or indemnify OEPC for 40% of the alleged costs and expenses. We discuss each claim in more detail along with OEPC's affirmative defenses.

123. The first claim arises out of the original ICSID Tribunal's decision, confirmed by the ICSID Annulment Committee, to reduce by 25% the amount of damages it would award OEPC for Ecuador's expropriation of Block 15. The Tribunal based the reduction on OEPC's contributory fault in failing first to obtain Ecuador's consent before entering into the Farmout Agreement and transferring rights in the Participation Contract to Andes.[70] The effect of the Tribunal's decision was to reduce the amount of damages to be awarded by $353,930,000. OEPC alleges that Andes is obligated to pay OEPC 40% of this sum, i.e., $141,570,000, under the Letter Agreement, the JOA and the Farmout Agreement.

124. With regard to the Letter Agreement, OEPC contends that the 25% contributory fault reduction is a reimbursable "cost and expense . . . related to the Caducity Proceedings" under all four subparagraphs of paragraph 2(d): It was, variously, a "reasonable cost[] and expense[] associated in any way with the Caducity Proceedings" under the first sentence of paragraph 2(d);[71] a "penalty or fine related to the Caducity Proceedings" under paragraph 2(d)(i);[72] a "cost[] and expense[] of any pursuit of legal remedies related to the Caducity Proceedings" under paragraph 2(d)(iii);[73] and a "reasonable cost[] and expense[] incurred OEPC in any way related to the Caducity Proceedings" under the catch-all paragraph 2(d)(iv).[74] In each instance, the Letter Agreement requires Andes to "reimburse or . . . pay" OEPC for 40% of all such costs and expenses related to the Caducity Proceedings.

125. In contending that the 25% reduction qualifies as a "penalty or fine" under paragraph 2(d)(i), OEPC notes that the ICSID Tribunal found that OEPC, in failing to obtain Ecuador's consent to the transfer of rights, had "committed an unlawful act" in violation of Ecuador's hydrocarbon law.[75] It also quotes Black's Law Dictionary to demonstrate that the term "penalty" has many broad meanings, including "[a]n extra charge against a party who violates a contractual

---

[70] JX5, ICSID Award, ¶¶ 687, 876(iv) & (v).

[71] OEPC Post-Hearing Br., ¶¶ 10, 18, 23.

[72] OEPC Statement of Claim, ¶¶ 70, 77, 113, 116, 121; OEPC Statement of Reply, ¶ 63; OEPC Post-Hearing Br., ¶ 10.

[73] OEPC Post-Hearing Br., ¶¶ 10, 23.

[74] OEPC Statement of Claim, ¶¶ 79, 116; OEPC Post-Hearing Br., ¶¶ 9, 10, 24.

[75] JX5, ¶ 680.

provision."[76] It contends that even if the 25% reduction for contributory fault were held not to be a "penalty or fine," the result would be the same because the cost and expense would still fall under three other provisions in paragraph 2(d), as discussed below.

126.     The second claim arises out of the Settlement Agreement in which OEPC accepted a settlement amount from Ecuador that was 30% less than the face value of the Final ICSID Award plus interest. The effect of the Settlement Agreement was to reduce the amount of OEPC's recovery by $419,870,000. OEPC alleges that Andes is obligated to pay 40% of this sum, i.e., $167,948,463.14, under the Letter Agreement, the JOA and the Farmout Agreement.

127.     Relying on the Letter Agreement, OEPC contends that the 30% settlement reduction is a reimbursable "cost[] and expense [] associated. . . with the Caducity Proceedings" under paragraph 2(d) of the Letter Agreement.[77] As it states in its Post-Hearing Brief:[78]

> Under the Letter Agreement, as a "cost[] and expense[] associated … with the Caducity Proceedings[,]" . . . [the settlement reduction] is reimbursable under the base Section 2(d) as well as Sections 2(d)(iii), and 2(d)(iv).

OEPC maintains that accepting less than the face value of the Final ICSID Award in return for Ecuador's agreement to pay immediately was part of the "costs and expenses [that OEPC] incurred in connection with the specific Joint Operation of OEPC's pursuit of Ecuador in light of the Caducity Proceedings."[79] In addition, it contends that the Tax and Labor Amounts that were released in the Settlement Agreement are "costs and expenses" that fall under paragraphs 2(d), 2(d)(iii), and 2(d)(iv).[80]

128.     OEPC also contends that Andes is obligated to pay 40% of both the 25% contributory fault reduction and the 30% settlement reduction pursuant to the Farmout Agreement and the JOA. It states that these reductions were losses, costs and expenses it incurred as Operator in the pursuit

---

[76] OEPC Post-Hearing Br., ¶ 15.

[77] OEPC Statement of Claim, ¶¶ 18, 79.

[78] OEPC Post-Hearing Br., ¶ 25.

[79] OEPC Post-Hearing Br., ¶ 9 & n. 2.

[80] OEPC Statement of Claim, ¶¶ 18, 79; OEPC Post-Hearing Br., ¶¶ 9 & n. 2, 24. 25.

of Joint Operations.[81] It further contends that these Agreements contemplated that, as Operator, OEPC would not suffer any loss beyond its participating share.[82] OEPC states that it has nonetheless suffered the entirety of the costs and expenses reflected by the 25% contributory fault reduction and 30% settlement reduction; it contends that these reductions were losses and were assessed only against OEPC's 60% share. Regarding the contributory fault reduction, it asserts that the "value of the Penalty . . .was *paid by OEPC to Ecuador* out of OEPC's share alone."[83] It likewise argues that in the Settlement Agreement, only OEPC's "cause-of-action asset" was monetized and then extinguished via settlement.[84] It analogizes the present case to the situation where operator-owned property is damaged during joint operations. In such event, OEPC as operator is entitled to charge the joint account for the losses and obtain 40% indemnification from Andes as non-operator. At the same time, it alleges, the Final ICSID Award and the Settlement Agreement excluded and preserved Andes' 40% share; Andes' "cause-of-action asset" remains intact. In OEPC's view, Andes has paid nothing and did not share in OEPC's loss. OEPC contends that it is entitled to charge the joint account for this loss and obtain 40% indemnification from Andes. Consequently, OEPC states that it is entitled to be indemnified by Andes under Section 4.6 of the JOA to ensure that OEPC bears only its 60% share.[85]

129.    OEPC states that it also satisfied the Tax and Labor Liabilities through an offset in the money it received from Ecuador in the Settlement Agreement. It contends that Andes has not paid any part of the Tax and Labor Amounts or the remaining losses under the Settlement Agreement.[86]

130.    OEPC asserts the affirmative defenses of estoppel, quasi-estoppel, and unclean hands. OEPC further denies that the Final Award in the Andes-OEPC Arbitration precludes its present claims under the doctrines of res judicata or collateral estoppel. It contends that res judicata only

---

[81] OEPC Statement of Reply, ¶ 1, citing JX2, JOA, ¶ 3.2.1, ¶ 3.3.3, & ¶ 8.6; JX1, Farmout Agreement, ¶ 2.03.

[82] JX3, JOA, ¶ 4.5.

[83] OEPC Statement of Reply, ¶ 38.

[84] OEPC Statement of Reply, ¶ 6.

[85] OEPC Statement of Claim, ¶ 120.

[86] JX4, §§ 1.1 & 1.4

barred re-litigation of claims that were actually litigated, although it acknowledges that in some circumstances res judicata can extend to claims that could have been raised in the prior action if adjudication of the new claims would impair rights or interests previously established. It disputes that adjudication of its present claims would have such effect. It further contends that collateral estoppel does not apply because its current claims were not decided in the prior arbitration.

131.    OEPC requests an award of $309,518,463.14, reflecting Andes' 40% share of the losses OEPC has suffered as Operator; pre-award interest for all amounts as provided in the JOA; and attorneys' fees and costs incurred in this proceeding.

## B. Respondent's Position

132.    Andes denies that it breached any of the Agreements. It disputes that the ICSID Tribunal's 25% reduction of the damages to be awarded based on OEPC's contributory fault is a "penalty" under paragraph 2(d) of the Letter Agreement or even a loss to OEPC. It points out that OEPC incurred no out-of-pocket expense and paid nothing in connection with the contributory fault reduction; there was no penalty or fine dispensed.[87] In fact, rather than paying money, OEPC gained nearly $1 billion via the ICSID Tribunal's Award. The ICSID Tribunal reduced the damages as a matter of international law based on principles of causation and contributory fault, but the effect of the Tribunal's decision was merely that the Award was smaller than it might have otherwise been. Andes maintains that a reduction in the Award amount is not a loss to OEPC. In addition, Andes contends that it bore its 40% share of the effect of this decision by virtue of the fact there was less to be divided between OEPC and Andes under paragraph 2(g) of the Letter Agreement as a result of the contributory fault reduction. Because Andes has already borne 40% of the contributory fault reduction, OEPC's present claim is an improper attempt at a double recovery.

133.    Andes cites case authority holding that "[a] 'penalty' is a 'punishment, whether corporal or pecuniary, imposed and enforced by the State, for a crime or offen[s]e against its laws."[88] It maintains that the contributory fault reduction does not qualify as a "penalty" because it was not a

---

[87] Andes Statement of Defense, ¶ 125; Andes Post-Hearing Br., ¶ 7.

[88] Andes Statement of Defense, ¶ 127, citing *Kokesh v. S.E.C.*, 137 S. Ct. 1635, 1642 (2017) (citations omitted).

punishment and was not imposed by the Government of Ecuador. It cites Black's Law Dictionary to the effect that a fine is a "pecuniary criminal punishment or civil penalty payable to the public treasury."[89] Again, Andes states that the contributory fault reduction does not meet that definition. Moreover, Andes contends that at the December 2022 hearing in this Arbitration, OEPC admitted that it did not make any affirmative payment but simply received a reduced amount.[90] It also contends that OEPC's claim does not constitute a "damage, loss, cost. expense or liability"[91] under the JOA that is capable of indemnification or reimbursement by Andes.

134.    Andes denies that the 30% reduction reflected in the Settlement Agreement is a loss or otherwise a cost or expense for which it must indemnify OEPC. It contends that this reduction impacted both OEPC's and Andes' recovery from Ecuador. Andes bore the effect of this reduction in proportion to its 40% interest in Block 15.[92] Andes contends that OEPC is now seeking to have Andes bear twice the reductions in its share of the Settlement Agreement.

135.    Andes raises several affirmative defenses in response to OEPC's claims. First, it contends OEPC's claims are barred by the doctrine of res judicata because they are allegedly part of the same transaction that the Andes-OEPC Tribunal adjudicated. It contends that OEPC's claims, if granted, would impair the rights and interests established by the Andes-OEPC Final Award and would reduce the amounts it was awarded.

136.    Second, Andes contends that the claims are barred by the doctrine of collateral estoppel because OEPC seeks to re-litigate the same factual and legal issues the Andes-OEPC Tribunal already decided.

137.    Even if not barred by these doctrines, Andes maintains that OEPC's claims fail because OEPC released Andes from all claims in connection with the Caducity Proceedings pursuant to paragraph 2(a) of the Letter Agreement, where the Parties stipulated that neither "shall make any

---

[89] Fine, *Black's Law Dictionary* (11th ed. 2019).

[90] Andes Post Hearing Br., ¶ 62.

[91] JX2, JOA, § 4.6.

[92] Andes Post Hearing Br., ¶ 58.

claim against the other for liability or fault in connection with the Caducity Proceedings."[93] Andes further contends that OEPC cannot establish the elements of a breach of contract because, *inter alia,* it has not performed its own obligations under the Letter Agreement, including by making the payments required under paragraph 2(g).

138.    OEPC requests an award denying OEPC's claims on the above grounds, including on the ground that they are precluded by the doctrines of res judicata and collateral estoppel. It further requests reimbursement of its legal fees and costs, including Andes' attorneys' fees and expenses and its share of the AAA-ICDR fees for administering the arbitration and other costs of the arbitration.

## V.    ANDES' AFFIRMATIVE DEFENSES: DOCTRINE OF RES JUDICATA

139.    The Tribunal will first address Andes' affirmative defense of res judicata.

### A.  Positions of the Parties

#### 1.    Respondent's Position

140.    Respondent Andes contends that the doctrine of res judicata or claim preclusion bars OEPC's claims in this Arbitration. It notes that under New York law, res judicata operates to preclude parties from re-litigating claims that could have been raised in prior proceedings. Andes contends that OEPC's present claims not only could have, but should have, been raised in the Andes-OEPC Arbitration.[94]

141.    Andes maintains that to establish res judicata, a party must demonstrate that the prior proceedings resulted in *"*(1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving (i) the same parties or their privies and (ii) the same cause of

---

[93] JX3, Letter Agreement, ¶ 2(a).

[94] *See* Respondent Andes' Statement of Defense, ¶¶ 85-111; Respondent Andes' Statement of Rejoinder, ¶¶ 31-44; Respondent Andes' Post-Hearing Br., ¶¶ 34-44. The authorities cited *infra* in notes 95-100 are those relied on by Respondent in the above-referenced submissions.

action."[95] It asserts that all of these elements are met in this case.

142.    To determine whether the causes of action in two proceedings are the same, Andes contends that New York courts adopt a "transactional" approach.[96] Under this standard, once a final judgment is issued, "all other claims arising out of the same transaction or series of transactions are barred, even if based upon different [legal] theories or if seeking a different remedy."[97] In determining whether two claims arise out of the same transaction, it notes that the New York Court of Appeals has found as persuasive factors such as "whether the claims turn on facts that are related in time, space, origin or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding."[98]

143.    Andes points out that New York courts, in identifying factors that can be influential in determining whether a subsequent claim is barred by res judicata, have focused on whether the subsequent claim derives from the same "*factual grouping*" and whether it involves the same acts,[99] or the same evidence.[100]

144.    Andes argues that all of these requirements are met in this case: First, the Final Award in the Andes-OEPC Arbitration was a final and binding determination on the merits of the dispute between Andes and OEPC with regard to the amounts owed to Andes under the Letter Agreement following (1) the *Caducidad* Decree of Block 15 Participation Contract; (2) the Final ICSID Award in the Occidental-Ecuador ICSID Arbitration; (3) the *ad hoc* ICSID Committee's Annulment Decision; and (4) the Settlement Agreement between Occidental and Ecuador.  The Andes-OEPC Final Award has since been converted into a final judgment by the U.S. District

---

[95] *In re Teltronics Servs, Inc.* 762 F.2d 185, 190 (2d Cir. 1985).

[96] *People ex rel. Spitzer v. Applied Card Systems, Inc*., 11 N.Y.3d 105,122 (N.Y. 2008).

[97] *Hoffer v. Bank of Am., N.A*., 136 A.D.3d 750, 751 (2d Dep't 2016). *See also Bayer v. City of N.Y.*, 115 A.D.3d 897, 898-99 (2d Dep't 2014) (affirming lower court's decision that complaint was barred by the doctrine of res judicata even if the "causes of action and legal theories alleged [therein were] different from those alleged in the [prior] action.")

[98] *Simons v. Trans Express Inc.,* 37 N.Y.3d 107, 111 (N.Y. 2021).

[99] *In re Pinnacle Env't Sys, Inc.*, 305 A.D.2d 897 at 898.

[100] *City of Yonkers v. Dyl & Dyl Dev. Corp*., 67 Misc.2d 704, 709 (Sup. Ct. Westchester Cnty. 1971).

Court for the Southern District of New York.[101]

145.     Second, the Andes-OEPC Tribunal was competent to issue the Final Award. Third, OEPC's present claims involve the same parties that were involved in the Andes-OEPC Arbitration.

146.     Fourth, the prior proceedings involved the same cause of action under New York's "transactional" approach to res judicata. With regard to the transactional test, Andes contends that the claims addressed in the Andes-OEPC Arbitration and OEPC's claims in this Arbitration all arise out of the same set of facts ("factual grouping"): the Parties' execution of the Letter Agreement as an amendment to the Farmout Agreement and JOA; Ecuador's declaration of Caducity of the Block 15 Participation Contract; and Occidental's pursuit of legal proceedings against Ecuador for the expropriation of Block 15. In addition, Andes asserts that the Andes- OEPC Arbitration and this Arbitration both center on the amount of compensation Andes is ultimately entitled to receive under the Letter Agreement as a result of:

> (1) the ICSID Award (which reflected a 25% reduction in the amount of damages to be awarded to account for OEPC's contributory fault in failing to obtain Ecuador's consent to the transfer anticipated in the Farmout Agreement);

> (2) the Annulment Decision and Final ICSID Award (which held that Occidental lacked standing to recover for Andes' 40% economic interest in Block 15); and

> (3)  the Settlement Agreement (which reflected a discount of 30% from the amount of the Final ICSID Award and included a release of the Tax and Labor Liabilities.)

Andes contends that the evidence that OEPC relies on to advance its present claims is also the same as that in the Andes-OEPC Arbitration, namely the relevant agreements concluded between the Parties (the Letter Agreement, the JOA and the Farmout Agreement), as well as the Settlement Agreement.

---

[101] *See Andes Petroleum Ecuador Ltd. v. Occidental Exploration and Production Company*, 1:21-cv-03930-AKH, (S.D.N.Y), Final Judgment, December 2, 2021.

147.     Andes further maintains that the facts on which OEPC relies for its breach-of-contract claims were known to it at the time of the Andes-OEPC Arbitration and that OEPC's present claims could have been asserted then. Thus, according to Andes, OEPC was aware of the 25% contributory fault reduction in the ICSID Award, the 30% discount Occidental accepted in the Settlement Agreement, and the settled Tax and Labor Amounts. Relying on the testimony of Mr. Gerald Ellis, then president of OEPC, Andes contends that in 2016 OEPC had all of the inputs it now uses to calculate OEPC's alleged losses and Andes' 40% share of those alleged losses.[102] It asserts that there is no reason why OEPC could not have asserted the present claims as counterclaims or offsets in the Andes-OEPC Arbitration.

148.     Finally, Andes contends that OEPC cannot rely on New York's permissive counterclaim rule to avoid the bar of res judicata.[103] It cites New York case law holding that the lack of a compulsory counterclaim requirement "does not . . . permit a party to remain silent in the first action and then bring a second one on the basis of a preexisting claim for relief that would impair the rights or interests established by the first action."[104] It contends that OEPC's claims in this case would "impair or destroy rights or interests established by" the Final Award in the Andes-OEPC Arbitration. The "rights" and "interests" determined in the Andes-OEPC Arbitration, based on paragraph 2(g) of the Letter Agreement, were Andes' entitlement to its 40% share of the "net amount received" from Ecuador in the Settlement Agreement. Here, Andes asserts that although OEPC purports to frame its claims in different terms, the effect of OEPC's claims would be to reduce the amount finally awarded to Andes in the Andes-OEPC Arbitration. Rather than receiving $391,879,747 (40% of the Settlement Agreement amount of $979,699,368) as the Andes-OEPC Tribunal ordered,[105] it would receive only $82,361,284 (8.4% of that amount); OEPC's share would grow from 60% to 91.6% of the Settlement Amount. OEPC would recover from Andes 40% (the sum of $141,570,000) of the 25% contributory fault reduction, and 40% (the sum of $167,699,368) of the 30% settlement discount, for a total of

---

[102] Merits Hearing Transcript, Day 2, 247:4-23; 259:19-23. (Mr. Ellis).

[103] New York does not have a compulsory counterclaim rule. *See* Siegel, NY Practice § 452, at 598-599.

[104] *Henry Modell & Co. v. Minister Elders & Deacons of Reformed Protestant Dutch Church of N.Y.C*, 68 N.Y.2d 456, 462 n. 2 (N.Y. 1986).

[105] JX7, Final Award, paras. 337, 347.

$309,518,463.14. Andes maintains that the doctrine of res judicata squarely applies in this case to preclude OEPC's attempt to impair Andes' recovery in the Andes-OEPC Arbitration and that its claims should be dismissed.

## 2. Claimant's Position

149.    Claimant OEPC contends that its claims in this Arbitration are not barred by the doctrine of res judicata.[106] First, it maintains that the Andes-OEPC Final Award decided only what OEPC owed Andes under paragraph 2(g) of the Letter Agreement. It did not decide the question presented by OEPC's present claims, i.e., what does Andes owe OEPC under paragraphs 2(d) and 2(f) of the Letter Agreement and section 4.6 of the JOA?  It contends that neither Party previously submitted any claims concerning what Andes owes OEPC under these provisions.

150.    Second, OEPC says that it was not legally required to submit its present claims in the Andes-OEPC Arbitration. It maintains that AAA Rule-5(b) provides that counterclaims are purely permissive and that New York law also views counterclaims as permissive. OEPC notes that res judicata does not bar claims for separate or different relief that could have been (but was not) interposed in the parties' prior action.[107] It cites the testimony of Ms. Backus and Mr. Ellis, who explained that in the Andes-OEPC Arbitration OEPC focused on defending against Andes' claims, leaving for another day the "true up" of the Parties' other obligations, particularly Andes' obligations to OEPC under paragraphs 2(d) and 2(f) of the Letter Agreement.[108]

151.    OEPC acknowledges that the permissive counterclaim rule is not an exception to res judicata where the preexisting claims brought after the prior litigation "would impair the rights or interests established in the first action."[109] But it contends that this is a narrow exception and that reducing the amounts awarded to Andes in the prior Andes-OEPC Arbitration does not mean that Andes' rights would be impaired; netting less money does not, in OEPC's view, suffice to

---

[106] Claimant OEPC's Statement of Claim, ¶¶ 149-57, Claimant OEPC's Statement of Reply, ¶¶ 7-12; Claimant OEPC's Post-Hearing Brief, ¶¶ 26-35. The authorities cited *infra* in notes 107, 109 and 110 are those relied on by Claimant in the above-referenced submissions.

[107] *Paramount Pictures Corp. v. Allianz Risk Transfer AG,* 36 N.Y.S.3d 11, 14 (N.Y. App. Div. [1st Dep't] 2016).

[108] Merits Hearing Transcript, Day 2, 352:2-11 (Ms. Backus); 258:5-22 (Mr. Ellis).

[109] *Caracus v. Conifer Central Square Assoc.,* 158 A.D.3d 63, 72 & n.2 (4th Dep't 2017).

constitute an impairment of rights.[110]

152.    OEPC maintains that nothing about its present claims impairs the rights established in the Andes-OEPC Final Award. Quoting that Award, it notes that the prior proceeding was limited to deciding "whether Andes was entitled to a 40% share in the net amount received as provided in paragraph 2(g)."[111] The present action involves whether OEPC is entitled to recover compensation under separate sections of the Letter Agreement (i.e., paragraphs 2(d) and 2(f)), and section 4.6 of the JOA.[112] It contends that Andes' right to claim 40% of the benefit of a recovery from Ecuador under paragraph 2(g) was independent of Andes' obligation to "reimburse or pay" OEPC under paragraph 2(d) for its 40% share of all the costs OEPC incurred to obtain that recovery.[113] Moreover, it notes that the prior Andes-OEPC Final Award does not mention, much less resolve, whether Andes breached its obligations to "reimburse or pay" the amounts specified in paragraph 2(d) of the Letter Agreement.[114] The Award mentions paragraph 2(d) only three times,[115] and none of these references indicates that the Tribunal was deciding any issue of Andes' liability to OEPC under paragraph 2(d). OEPC points out that Andes has admitted in its Post-Hearing Brief that in the Andes-OEPC Arbitration OEPC never alleged that it had incurred the losses for which it now seeks to recover or suggested that Andes' recovery under paragraph 2(g) should be reduced accordingly.[116] Andes has also agreed that "OEPC was not strictly obligated to raise its claims as counterclaims in the first arbitration."[117]

153.    Lastly, OEPC contends that the Andes-OEPC Tribunal did not purport to resolve the

---

[110] *Lot 1555 Corp. v. Nahzi*, 79 A.D.3d 580 (1st Dep't 2010).

[111] JX7, Andes-OEPC Final Award, ¶ 219.

[112] OEPC contends that section 4.6 of the JOA (JX2) obligates Andes to indemnify OEPC, as Operator in the conduct of Joint Operations, for the losses, costs and expenses it incurred in the ICSID Arbitration and the Ecuador Settlement to the full extent of Andes' 40% share. It also relies on section 4.2.2.3, which states that OEPC shall not "suffer a loss as a result of being the Operator in its conduct of Joint Operations." It contends that Andes' failure to pay and reimburse OEPC and thus indemnify it for the alleged losses is also a breach of the Farmout Agreement (JX1).

[113] *Id.,* ¶ 65.

[114] JX7, Andes-OEPC Final Award, ¶¶ 168, 175, 215.

[115] OEPC Post-Hearing Br., ¶ 71.

[116] *See* Andes Post-Hearing Brief, ¶ 3.

[117] *Id.,* ¶ 4.

Parties' ultimate economic relationship or give Andes the right to a specific net allocation. It notes that the Tribunal acknowledged that:

> . . . jurisdiction in this arbitration is to resolve the narrow question of whether the Letter Agreement renders Occidental liable to Andes to share some portion of the amount recovered from Ecuador through the ICSID Arbitration. Occidental and Andes have suffered losses in relation to Ecuador's expropriation of Block 15, but it is not the remit of this Tribunal to make the Parties whole with respect to those losses or to "even up" the losses each has suffered.[118]

OEPC would interpret this statement to mean that the Tribunal was seemingly aware of the alleged "losses" for which OEPC now seeks to recover via "true-up" in this Arbitration, or at least the possibility of some type of additional losses, and was indicating that it lacked jurisdiction to adjudicate them, and thus left them to be resolved in a future arbitration.[119]

## B. Tribunal's Analysis and Decision

154.    The Tribunal presents its analysis and decision below by majority.  Arbitrator Pierce has separately submitted a dissenting opinion.

155.    The Tribunal begins by noting that the Parties agree on the basic principles of New York law governing the doctrine of res judicata. These points of agreement include the following legal principles:

156.    *First,* the burden of establishing that the requirements of the doctrine are met rests with the party asserting its application. Here, that party is Andes.

157.    *Second,* "[u]nder res judicata or claim preclusion, a valid final judgment bars future actions between the same parties on the same cause of action."[120] The Parties agree that the Final Award in the Andes-OEPC Arbitration was a final decision and that the U.S. District Court for the Southern District of New York subsequently entered it as a final judgment. The Parties also agree

---

[118] JX7, Andes-OEOC Final Award, ¶ 153.

[119] OEPC Post-Hearing Br., ¶ 67.

[120] *Simmons v. Trans Express Inc.*, 148 N.Y.3d at 111. Both Parties cite *Simmons* as authority.

that the parties in the Andes-OEPC Arbitration and this Arbitration are the same.

158.     *Third,* the remaining question is whether the two actions involve the same cause of action. In that regard, the Parties agree that New York courts have "consistently applied a 'transactional analysis approach' in determining whether an earlier judgment has claim preclusive effect, such that 'once a claim is brought to a final conclusion*, all other claims arising out of the same transaction or series of transactions* are barred, even if based upon different theories or if seeking a different remedy.'"[121] Thus, "the claim preclusion rule extends beyond attempts to litigate identical claims."[122]

159.     *Fourth,* "to determine whether two claims arise out of the same transaction or series of transactions, [the New York Court of Appeals has] . . . held that courts should analyze whether the claims turn on facts that are 'related in time, space, origin or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." [123]

160.     Applying these principles, the Tribunal finds that both actions are based on the same cause of action. The claims in the Andes-OEPC Arbitration and this Arbitration "aris[e] out of the same transaction or series of transactions."[124] In terms of agreements, the series of transactions giving rise to both sets of arbitral claims are the Letter Agreement, the JOA, the Farmout Agreement, and the Settlement Agreement. In terms of the arbitral awards, the series of transactions giving rise to both sets of arbitral claims are the same transactions that are the subject of the initial ICSID Award, the Final ICSID Award, and the Andes-OEPC Final Award. More specifically, OEPC's claim that Andes should pay for 40% of the 25% contributory fault reduction relates to the Final ICSID Award. Its claim that Andes should pay for 40% of the 30% difference between the amount of the Final ICSID Award and the amount Occidental ultimately agreed to accept from Ecuador in the Settlement Agreement relates to the same transaction that was the subject of the Andes-OEPC Final

---

[121] *Id.* (emphasis in original) (citations omitted).

[122] *Id.*

[123] *Id.* (internal quote marks omitted) (citations omitted).

[124] *Simmons v. Trans Express.,* 148 N.Y.3d at 111.

Award.

161.     Thus, Andes' claims in this Arbitration and in the Andes-OEPC Arbitration grew out of all four of the referenced agreements (i.e., the Letter Agreement, the JOA, the Farmout Agreement, and the Settlement Agreement) as well as the ICSID Annulment Decision and Final ICSID Award. OEPC's present claims trace back to the same agreements and arbitrations that were the subject of the Andes-OEPC Arbitration. The Parties' disputes in this Arbitration and in the Andes-OEPC Arbitration were all set in motion by Ecuador's initiation of Caducity Proceedings and the subsequent cancellation of the Participation Contract in Block 15.

162.     OEPC argues that the cause of action in the Andes-OEPC Arbitration is different from the cause of action in this Arbitration because the prior arbitration concerned the issue of what amount OEPC owed Andes under paragraph 2(g) of the Letter Agreement, whereas the present arbitration involves the issue of what amount Andes owes OEPC under paragraph 2(d) of the Letter Agreement. But these paragraphs are directly interconnected. The "costs and expenses" that are the subject of paragraph 2(d) are the same "costs and expenses" that are referenced in paragraph 2(g) and that flow into the calculation of the "net amount received" under paragraph 2(g). Pursuant to paragraph 2(g), in determining the "net amount received, after all costs and expenses of the Caducity Proceedings have been reimbursed or paid," any "costs and expenses" under paragraphs 2(d) and 2(f) are to be deducted. That is what the Letter Agreement unambiguously provides; paragraphs 2(d) and 2(f) work in concert with paragraph 2(g). Any claim under paragraph 2(g) necessarily implicates paragraphs 2(d) and 2(f) because they are essential elements of the contractual formula by which the "net amount received" is calculated.

163.     On top of that, OEPC contends that all of the "losses" for which it seeks to recover in this Arbitration are "costs and expenses" under paragraphs 2(d) and 2(f); therefore, by contract they are all required to be factored into the calculation of the "net amount received" under paragraph 2(g) and were part of the same transaction that was the subject of the Andes-OEPC Final Award. If OEPC believed there were any additional "costs and expenses" that should have gone into the calculation of the "net amount received," the time to assert those claims was in the Andes-OEPC Arbitration.

164.     Specifically, OEPC contends that the 25% contributory fault reduction in the ICSID

Award fell within all four subsections of the paragraph 2(d) of the Letter Agreement. By OEPC's own argument, the 25% reduction was a "reasonable cost[] and expense[] associated . . . with the Caducity Proceedings" under the first sentence of paragraph 2(d);[125] a "penalty or fine relating to the Caducity Proceedings" under paragraph 2(d)(i);[126] a "cost[] and expense[]" of the "pursuit of legal remedies related to the Caducity Proceedings" under paragraph 2(d)(iii);[127] and a "reasonable cost[] and expense[] incurred by Occidental . . . related to the Caducity Proceedings" under paragraph 2(d)(iv).[128] Therefore, they all flow into the amount to be calculated under paragraph 2(g).

165.    Similarly, OEPC contends that the 30% settlement discount is a "cost[] and expense[]" under paragraph 2 of the Letter Agreement.[129] And it contends that the Tax and Labor Amounts are "costs and expenses" that fall under paragraphs 2(d), 2(d)(iii), and 2(d)(iv) of the Letter Agreement.[130] Again, by OEPC's own argument, they are amounts to be factored into the "net amount received" under paragraph 2(g).

166.    More fundamentally, in parsing the different clauses of the same paragraph of the Letter Agreement in an attempt to show that they give rise to different causes of action, OEPC ignores the "transactional analysis approach" adopted by New York courts. If the claims arise out of the same transaction or series of transactions (as we have found), it is no answer to say that the two sets of claims are not identical, or rely on different theories, or seek different remedies, or proceed under different subparts of the same contract.[131] If the two causes of action involve the same transaction or series of transactions, those two causes of action will be deemed to be the same, and

---

[125] OEPC Post-Hearing Br., ¶¶ 10, 18, 23.

[126] OEPC Statement of Claim, ¶¶ 70, 116, 121; OEPC Statement of Reply, ¶ 63.

[127] OEPC Post-Hearing Br., ¶ 23.

[128] OEPC Statement of Claim, ¶¶ 116, 121; OEPC Statement of Reply, ¶ 68; OEPC Post-Hearing Br., ¶

[129] OEPC Statement of Claim, ¶¶ 18, 79.

[130] OEPC Statement of Claim, ¶ 79; OEPC Post-Hearing Br., ¶¶ 9, 24.

[131] Thus, it does not matter that OEPC claims that it is independently entitled to recover the alleged costs, expenses, losses and penalties under the JOA or Farmout Agreement.

the second proceeding based on the same cause of action will be barred.[132]

167.     The Tribunal finds that the claims in this Arbitration could have been asserted in the Andes-OEPC Arbitration. As established through the testimony of Mr. Ellis, in 2016 OEPC had all of the inputs it needed to calculate the alleged losses, costs and expenses on which it bases its claims in this Arbitration.[133] OEPC knew the amount of contributory fault reduction imposed by the ICSID Tribunal, the amount of the 30% reduction Occidental accepted in the Settlement Agreement, and the amount of the Tax and Labor Liabilities covered by the releases in that Settlement Agreement. It knew how to calculate Andes' 40% share of these alleged losses, costs and expenses and how to assert a claim or offset for that amount.

168.     OEPC's decision not to raise these claims in the Andes-OEPC Arbitration was a deliberate choice. When asked why OEPC nonetheless waited until April 2021—a month after the Andes-OEPC Tribunal issued its Final Award—before sending a cash call to Andes for these losses, costs and expenses, Mr. Ellis replied:

> THE WITNESS: I mean, it would have been to our advantage, right. I mean, to put and try to get that money earlier, but there was some discussions going on, and just at that point in time, it didn't make sense to try to muddy the water of things going on by piling on another issue while the arbitration was going on.[134]

169.     Had OEPC submitted is present claims to Andes-OEPC Tribunal, and had they been upheld, they would have offset the damages otherwise due Andes under paragraph 2(g). Indeed, OEPC was aware of its right to assert offsets to any recovery under paragraph 2(g) and did so with respect to the $96 million in Tax and Labor Liabilities that were released in the Settlement Agreement. OEPC claimed it was entitled to "credit" for this amount, offsetting any damages

---

[132] OEPC contends that "Andes is obliged to reimburse or pay OEPC 40% of . . . [costs and expenses] under Letter Agreement 2(d), 2(d)(i), 2(d)(iii), and 2(d)(iv), and under JOA Section 4.6." OEPC Post-Hearing Br., ¶ 30. Further, it states that "Andes' Letter Agreement obligation to pay its 40% share of costs, expenses, and penalties related to the Caducity Proceedings is the mirror image of its broad obligation to indemnify the Operator for 40% of *all* losses in Joint Operations" under JOA section 4.6. *Id.*

[133] Merits Hearing Transcript, Day 2, 247:4-23; 259:19-23. (Mr. Ellis).

[134] *Id.,*267:16-22.

otherwise due Andes.[135]

170.    The Tribunal is also satisfied that the claims in the Andes-OEPC Arbitration and in this Arbitration are "related in time . . . [and] origin," "form a convenient trial unit," and that "their treatment as a unit conforms to the parties' expectations or business understanding. . . ."[136] To use OEPC's term, paragraph 2(g) contemplates a "true-up" between the Parties in determining "the net amount received, *after all costs and expenses* of the Caducity Proceedings" have been taken into account. It would have made no sense for the Parties in the Andes-OEPC Arbitration to have intended a piecemeal adjudication of the "net amount received," to have neglected any "costs and expenses of the Caducity Proceedings," and to have reasonably expected that OEPC would thereafter initiate a new arbitration claiming a right to reimbursement or offsets of additional "costs and expenses" that it had not previously mentioned.

171.    In effect, permitting OEPC's claim of additional "costs and expenses" to proceed would mean that Andes' 40 % share of the "net amount received" under paragraph 2(g), as determined in the Andes-OEPC Final Award, would have to be relitigated. The Andes-OEPC Final Award declared that the "net amount received, after all costs and expenses of the Caducity Proceedings have been reimbursed or paid," was $979,699,368 and that Andes was entitled to a payment of $391,879,747 from OEPC.[137] If successful in this Arbitration, OEPC's newly asserted claims of "costs and expenses" would, as a practical matter, reduce the amount that Andes was entitled to receive to $82,361,284, a difference of $309,518,453.

172.    Nevertheless, OEPC contends that in its Final Award the Andes-OEPC Tribunal limited the scope of its decision and carved out a right for OEPC to asset future claims to recover additional "costs and expenses." It relies on paragraphs 153 and 154 of the Final Award which state:[138]

153.    *Second*, the Tribunal notes that its jurisdiction in this Arbitration is to

---

[135] JX5, ¶ 329.

[136] *Simmons v. Trans Express Inc.*, 148 N.Y.3d at 111.

[137] JX7, Andes-OEPC Final Award, ¶ 347(c).

[138] JX7, Andes-OEPC Final Award, ¶¶ 153-54.

resolve the narrow question of whether the Letter Agreement renders Occidental liable to Andes to share some portion of the amount recovered from Ecuador through the ICSID Arbitration. Occidental and Andes have suffered losses in relation to Ecuador's expropriation of Block 15, but it is not the remit of this Tribunal to make the Parties whole with respect to those losses or to "even up" the losses each has suffered. Similarly, this Tribunal cannot revisit the ICSID Annulment Decision—despite whatever criticisms exist of it under Ecuadorian or public international law—that is ultimately the genesis of each party's passionately articulated belief that the other's interpretation of the Letter Agreement is unreasonable.

154. *Finally*, the Tribunal's task has been made all-the-more difficult because neither side's request for relief yields what the Tribunal considers to be the most equitable solution: Occidental seeks to keep for itself the entire proceeds of the ICSID Arbitration, while saddling Andes with all of the risks of pursuing (or not pursuing) recovery of its 40% economic interest from Ecuador; whereas Andes seeks to recover 40% of the Final ICSID Award Damages granted in respect of Occidental's 60% interest, while saddling Occidental with the consequences of Andes' decision not to pursue Ecuador for recovery of its remaining interest. The Tribunal, on the other hand, considers that, in a perfect world, the most commercially fair and sensible solution would be premised on the principle that Occidental and Andes share 60:40 in the amounts recovered (the gain) from the ICSID Arbitration, while likewise sharing 60:40 in the consequences, in terms of potential recoveries foregone (the pain), of any failure to pursue Ecuador for recovery of Andes' remaining interest in Block 15. Yet such an outcome is beyond the Tribunal's reach—neither of the Parties has proposed it, the Letter Agreement does not expressly provide for it, the evidentiary record the Parties compiled is insufficient to allow the Tribunal to quantify it, and the applicable New York law does not provide a legal basis for achieving it. In short, the Tribunal must determine the case submitted to it and on the record as presented.

173. For starters, neither in these paragraphs nor elsewhere in the Final Award does the Andes-OEPC Tribunal refer to the possibility of OEPC claiming additional "costs and expenses" in a future arbitration or otherwise making claims that would reduce the amount that the Tribunal held Andes was entitled to be paid as its "40% share in the net amount received, after all costs and expenses of the Caducity Proceedings."[139] The reason why the Tribunal did not refer to such claims is not a matter in dispute. OEPC concedes that it never mentioned that it possessed or possibly would in the future assert the claims it advances in this Arbitration. Therefore, the above paragraphs of the Award cannot reasonably be understood as expressing an intent by the Andes-OEPC Tribunal to preserve a right on OEPC's part to

---

[139] JX3, Letter Agreement, ¶ 2(g).

recover additional costs and expenses relating to the Caducity Proceedings or assert future claims that would in effect reduce the amount that the Tribunal held Andes was entitled to be paid as its share of the settlement with Ecuador.

174.     In addition, it is apparent to this Tribunal what the Andes-OEPC Tribunal was referring to when it stated in paragraph 153 of its Final Award that "it is not the remit of this Tribunal to make the Parties whole with respect to those losses or to 'even up' the losses each has suffered."[140] As it stated in the first clause of that sentence, the Andes-OEPC Tribunal was referring to the fact that "Occidental and Andes have suffered losses *in relation to Ecuador's expropriation of Block 15*. . . ."[141] As the very next sentence shows, it had in mind the ICSID Annulment Decision, which it said it could not "revisit," "despite whatever criticisms exist of that Annulment Decision under Ecuadorian or public international law."[142] It noted that, as Andes interpreted the consequences of that Annulment Decision, it "saddl[ed] Occidental with the consequences of Andes' decision not to pursue Ecuador for recovery of its remaining interest."[143] The Tribunal considered that outcome to be far from "the most commercially reasonable and sensible solution" and hypothesized what the solution would be in "a perfect world:"[144]

> The Tribunal, on the other hand, considers that, in a perfect world, the most commercially fair and sensible solution would be premised on the principle that Occidental and Andes share 60:40 in the amounts recovered (the gain) from the ICSID Arbitration, while likewise sharing 60:40 in the consequences, in terms of potential recoveries foregone (the pain), of any failure to pursue Ecuador for recovery of Andes' remaining interest in Block 15.

The Tribunal lamented that such a "perfect-world" solution was "beyond the Tribunal's reach."[145]

---

[140] JX7, Andes-OEPC Final Award, ¶ 153.

[141] *Ibid.*

[142] *Ibid.*

[143] *Id.,* ¶ 154.

[144] *Ibid.*

[145] *Ibid.*

175.     Given the entire context, it is our view that the Andes-OEPC Tribunal, in commenting that it was not its remit to make the Parties whole with respect to "those losses," was referring to the Parties' respective losses *vis-à-vis* Ecuador as a result of the Caducity Proceedings and expropriation of Block 15.  It was further referring to the fact that the burden of those losses seemed to fall unequally on the Parties, as a consequence of the Annulment Committee's decision holding that Occidental did not have standing to pursue a claim for Andes' economic interest in Block 15. This was compounded by the Andes-OEPC Tribunal's decision that Andes had no obligation to pursue its claim against Ecuador.[146]

176.     We are equally certain, moreover, that what the Andes-OEPC Tribunal did not have in mind were the alleged "losses" that OEPC now claims are recoverable as "costs and expenses" under paragraphs 2(d) and 2(f) (i.e., the 25% contributory fault reduction or alleged "penalty" and the 30% settlement discount). OEPC never mentioned the existence of such "losses" or costs and expenses during the Andes-OEPC arbitration. Moreover, had OEPC asserted such claims, they would clearly have been within the Andes-OEPC Tribunal's remit; paragraph 2(g) would have required that these alleged "losses" be considered and, if found to be reimbursable costs and expenses owed by Andes—which cannot be known without speculation—be deducted from Andes' share of the "net amount received" under that paragraph. There can be no question that adjudication of such "costs and expenses" would have been within the Tribunal's jurisdiction and that the Letter Agreement required that they have been addressed if asserted. OEPC does not contest that the Andes-OEPC Tribunal would have had jurisdiction over these claims, if asserted.

177.     Finally, OEPC points out that under New York law counterclaims are permissive, not mandatory.[147]  It also recognizes, however,  that New York's permissive counterclaim rule "does not . . . permit a party to remain silent in the first action and then bring a second one on the basis of a pre-existing claim for relief that would impair the rights or interests established in the first

---

[146] *Ibid.* ¶ 239.

[147] OEPC incorrectly states that AAA Rule R-5(b) provides that counterclaims are permissive, not mandatory. OEPC Post-Hearing Br., ¶ 74. That Rule merely states that a "respondent may file a counterclaim at any time after notice of the filing of the Demand is sent by the AAA, subject to the limitations set forth in Rule R-6." It does not address the circumstances in which a party that has a counterclaim must file it. That is governed by New York law.

action."[148] OEPC contends that its claims do not impair Andes' rights under paragraph 2(g) of the Letter Agreement because that provision allegedly applies only to netting off of costs and expenses that Andes had already paid (e.g., attorneys' fees and litigation costs) *before* Occidental received a monetary award against Ecuador or settlement funds from Ecuador. It argues that paragraph 2(d), by contrast, applies to costs and expenses that were unreimbursed and unpaid by Andes at the time Occidental received payment from Ecuador of the proceeds from the award or settlement.[149] In this Arbitration, OEPC notes that it seeks to recover costs and expenses that Andes allegedly has not paid (i.e., its share of the 25% contributory fault reduction or "penalty" and its share of the 30% settlement discount) by the time Occidental received the settlement proceeds from Ecuador.

178.    The Tribunal finds OEPC's proposed reading of paragraph 2 of the Letter Agreement to be strained and illogical. The language of paragraph 2(g) does not support the conclusion that it applies only to costs and expenses that Andes has already paid OECP before it received the settlement proceeds from Ecuador, and OEPC offers no explanation as to why such a distinction would make sense. The only reasonable interpretation of paragraph 2(g) is that the "net amount received" is calculated "after all costs and expenses of the Caducity Proceedings have been reimbursed or paid," irrespective of when that payment or reimbursement occurs in relation to Occidental's receipt of the settlement proceeds.

179.    In addition, in calculating the amount of Andes' entitlement to the net amount received under paragraph 2(g), the Andes-OEPC Tribunal was aware of paragraph 2(g)'s relationship to paragraph 2(d) and the need to deduct all of the costs and expenses under that provision in order to determine Andes' 40% share of the net amount under paragraph 2(g). As it stated:

> ***Consistent with paragraphs 2(c) and (d) of the Letter Agreement***, Andes did not participate as a party in the ICSID Arbitration but provided support in various forms, including but not limited to reimbursing Occidental for 40% of all reasonable costs and expenses incurred in relation to the *Caducidad* Proceedings (including the ICSID Arbitration), which amounted to some US$9,946,705.93. (*See* Andes SoC*, ¶¶*53, 100). Andes anticipated that, in accordance with paragraph 2(g) of the Letter Agreement, if Occidental "*receive[d] any monetary award*" in the ICSID Arbitration, it would be "*entitled to a 40% share in the net amount received.*" (*Id.*

---

[148] OEPC Post-Hearing Br., ¶¶ 79 & n. 39, quoting *Paramount Pictures Corp. v. Allianz Risk Transfer AG,* 36 N.Y.S.3d 11, 14 (N.Y. App. Div. [1st Dep't] 2016).

[149] OEPC Post-Hearing Br., ¶ 81.

¶60)[150]

Elsewhere, it similarly observed that costs under 2(d) and 2(f) had to be taken into account in determining Andes' 40% share of the net recovery:

> . . . it is more consistent with the Letter Agreement as a whole to understand *paragraphs 2(d), 2(f) and 2(g)* as simply establishing a duty on Andes to bear 40% of the "*cost*" of the *Caducidad* Proceedings (not only direct legal fees, but also including any penalties or other downsides that might arise in resolving the dispute) in exchange for the potential upside of 40% of any monetary award.[151]

180.    In its pleadings in the Andes-OEPC Arbitration, Andes affirmatively alleged that it had complied with its obligation under paragraph 2(d) to pay its share of all costs and expenses in connection with the Caducity Proceedings, entitling it to 40% of the recovery from Ecuador:

> Andes has duly remitted payment of all costs and expenses in connection with the Caducity Proceedings *as provided in paragraph 2(d)* of the Letter Agreement.[152]

OEPC did not take issue with Andes' allegation of compliance with paragraph 2(d) in the Andes-OEPC Arbitration. In this Arbitration, however, OEPC seeks to recover on the basis that its claims are for "costs and expenses" falling within the scope of paragraph 2(d).

181.    The Andes-OEPC Tribunal was also aware of the 25% contributory fault reduction in the ICSID Award and the 30% settlement discount reflected in the Settlement Agreement, including the release of the Tax and Labor Amounts. Indeed, OEPC argued that it was entitled to a "credit" of $96 million as a result of the release of the Tax and Labor Liabilities in the Settlement Agreement, thereby reducing the amount it would have to pay Andes under paragraph 2(g).[153] The Tribunal rejected that claim because in the Settlement Agreement Ecuador simply agreed to terminate the tax and labor proceedings; hence, there was no "monetary award" subject to paragraph 2(g). Despite its awareness of the contributory fault reduction and the termination of the Tax and Labor Liabilities, it is apparent that the Andes-OEPC Tribunal did not consider them as relevant to

---

[150] JX7, Andes-OEPC Final Award, ¶ 33.

[151] *Id.,* ¶ 175.

[152] Ex. R-17, ¶ 49.

[153] JX7, Final Award, ¶¶ 329-321.

its determination of the "net amount received' under paragraph 2(g) of the Letter Agreement or regard its calculation of that amount as in any way incomplete or requiring future adjustment. Moreover, in this Arbitration OEPC seeks to convert the same $96 million of released Tax and Labor Liabilities, which it previously claimed should be treated as a "credit" against any amount otherwise due Andes under the Letter Agreement, into "losses" for which Andes must pay its 40% share under the Letter Agreement. This fact further illustrates why OEPC's present claims are barred by the doctrine of res judicata.

182.    For the above reasons, the Tribunal by majority finds that that OEPC's claims, if pursued in this Arbitration, would impair the rights and interests of Andes as established in the Andes-OEPC Final Award. That Final Award determined that Andes was entitled to 40% of the net amount received from Ecuador after costs and expenses were deducted and that this amount was $391,879,747. OEPC's claims here would reduce that amount to $82,361,284 or just 8.4% of the Settlement Amount proceeds.[154] In effect, OEPC asks this Tribunal to redetermine Andes' entitlement to the net amount received under paragraph 2(g) and to eviscerate Andes' rights established under the Andes-OEPC Final Award by netting off additional alleged costs and expenses never asserted in that Arbitration. The doctrine of res judicata precludes such a claim. We therefore decide that OEPC's claims are barred by res judicata.

183.    The Tribunal's majority decision upholding Andes' affirmative defense of res judicata resolves the present dispute. It is therefore unnecessary for the Tribunal to address the merits of OEPC's breach-of-contract claims or the other contentions of the Parties except as to the matter of costs.


## VI.    COSTS

184.    Both Parties have requested an award of attorneys' fees and costs. The Tribunal has

---

[154] Citing *Lot 1555 Corp. v. Nahzi*, *supra* n. 18, OEPC contends that netting less money as a result of a second action not suffice to constitute an impairment of rights. But unlike the present case, in *Lot 1555 Corp* the causes of action in the two lawsuits were different. The first involved a claim to a percentage of the sale price of real property; the second, which was an action against the plaintiff in the first action, involved a loan to purchase a cooperative apartment. The second action did not impair any rights established in the first action.

authority to make such an award pursuant to Rules R-47(c) and (d) of the AAA Commercial Arbitration Rules and paragraph 3(f) of Exhibit H to the Farmout Agreement. The Tribunal has the discretion to determine the amount and apportionment of such fees and costs awarded as it determines is appropriate.

185.    Rule R-47(c) provides:

> In the final award, the arbitrator shall assess the fees, expenses, and compensation provided in Sections R-53 [AAA Administrative Fees], R-54 [Expenses], and R-55 [Arbitrator's Compensation]. The arbitrator may apportion such fees, expenses and compensation among the parties in such amounts as the arbitrator determines is appropriate.

186.    Rule R-47(d)(ii) provides: "The award of the arbitrator(s) may include … ii. an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement."

187.    In addition, paragraph 3(f) of Exhibit H to the Farmout Agreement provides: "The costs of the arbitration proceedings (including attorneys' fees and costs) shall be borne in the manner determined by the arbitrators."

### A.    Positions of the Parties

188.    OEPC seeks a cost award in the total amount of $2,726,661.63. This sum includes attorneys' fees of $2,068,029.04; costs and disbursements of $20,847.71; expert witness costs of $88,334.86; and arbitration costs of $549,450.02. OEPC contends that it should be awarded all of its attorneys' fees and costs in the event it prevails on any of its claims. It notes that the bulk of its legal efforts have focused, not on establishing its claims, but on overcoming defensive arguments, such as res judicata and collateral estoppel, that Andes lodged against those claims. It contends that, in particular, it should be awarded the attorneys' fees it incurred in bringing applications to raise new claims on the basis of Exhibit C80 and for discovery relief. It points out that Exhibit C80 was produced by Andes only after the pleadings were closed and only because its current counsel felt required to "correct the record" (Exhibit C81) given Andes' inaccurate representation in its responses to OEPC's document production requests. It maintains that it had a good-faith basis for seeking to assert these new claims in light of Exhibit C80 and that its request to bring those claims

was far from being frivolous.[155]

189.     Andes seeks a cost award in the total amount of $6,842,878.56. This sum includes attorneys' fees of $5,820,534.53; costs and disbursements of $316,400.18; fact witness and expert witness costs of $207,201.34; and arbitration costs of $498,742.51. Andes urges the Tribunal to take the "prevailing party" approach to the allocation of costs. It maintains that it has proven that OEPC's claims are meritless and that their only purpose was to re-litigate and collaterally attack the Andes-OEPC Final Award and delay payment of that Award. It contends that the present arbitration could have been avoided if OEPC had brought its present claims in the Andes-OEPC Arbitration.

190.     In addition, Andes contends that OEPC's procedural conduct caused the Parties and the Tribunal to incur unnecessary costs. In that regard, it cites OEPC's failed objection to the appointment of one of the arbitrators; its opposition to Andes' Application for Security for Costs, which eventually led to the issuance of P03 and the entry of an agreement under which OEPC posted $4.5 million as security. It further points to OEPC's inclusion of a new Count Three ("Breach of JOA Conflicts and Farmout Disclosure Requirements") in its SOC dated June 8, 2022, which led to the Tribunal's issuance of PO6 striking Count Three and denying OEPC leave to assert this new claim. Andes also notes that in PO7 the Tribunal denied OEPC's Application for Live Witness Testimony.

191.     Further, Andes contends that OEPC's conduct in the document production phase also generated undue costs that could have been saved; specifically, it argues that OEPC sought overly broad categories of documents in what was equivalent to a fishing expedition. It notes that out of the 23 categories of documents sought by OEPC, in PO4 the Tribunal granted only two of those requests. In contrast, Andes made only four document requests, all of which the Tribunal granted or partially granted.

192.     In addition, Andes seeks costs in connection with OEPC's filing of Applications for Leave

---

[155] OEPC's Letter Application for Fees and Costs included, as Appendix B, an Expert Report from a retired federal district court judge (now of counsel and a New York City law firm), the Hon. Shira Scheindlin. In Procedural Order No. 15, the Tribunal granted Andes' Application to Strike Appendix B and its accompanying legal authorities. None of the issues addressed in that Expert Report is relevant to the Tribunal's decision regarding the amount and apportionment of the attorneys' fees and costs to be awarded.

to Amend its Statements of Claim and Reply and for Discovery Relief, which were based on the theory that Exhibit C80 showed that Andes or its shareholders negotiated a side deal with Ecuador as compensation for its interest in Block 15. The Tribunal denied OEPC's Applications for the reasons later stated in PO12. Andes also seeks costs in connection with OEPC's Renewed Application for Leave to Amend its Statement of Claim, which the Tribunal denied in PO14. Andes further contends that an award of costs is warranted because OEPC allegedly acted in bad faith. It points out that in PO14 the Tribunal concluded that OEPC had not shown that there was a good-faith basis, from a factual and legal standpoint, for allowing new claims to be added that alleged (1) that Andes was prohibited from engaging or negotiating with Ecuador in December 2015; (2) that a causal link existed between, on the one hand, OEPC's decision to accept a 30% discount in the Settlement Agreement with Ecuador and, on the other, Andes' December 2015 meeting with Attorney General Garcia; (3) that the Settlement Agreement would not have been executed had OEPC known about the December 2015 meeting; and (4) that Andes owed a fiduciary duty under the JOA despite the absence of any such duty under that agreement.

193.     In its reply, OEPC denies that it caused the Parties to incur any unnecessary fees and costs.  In addition, it contends that Andes' request for fees and costs is facially unreasonable because, among other things, it is two-and-a-half times the amount that OEPC seeks ($6.8 million versus $2.7 million). It argues that a reasonable rule of thumb is that in most cases the number of fee-earner hours expended by the sides will be within about one-third of each other and that, using OEPC's request as a yardstick, Andes' request is excessive on its face. It also points out that in the Andes-OEPC Arbitration, which lasted three-and-a-half years and encompassed multiple contested hearings, Andes there sought an award of around $5 million for its attorney's fees and costs—over $1.5 million less that it seeks here.

194.     OEPC also argues that almost $2 million of the almost $7 million fees and costs that Andes claims were associated with Andes' "document-collection verification process" in other litigation and resulted from Andes' initial failure to produce Exhibit C80. It contends that these costs are not related to this Arbitration but instead to the DCL Action that it brought against OEPC's parent company in New York State Court alleging fraudulent transfer. It asserts that Andes' having to re-do the search process was necessitated by its own failure previously to produce Exhibit C80.

195.     OEPC further contends that Andes should not be awarded attorneys' fees relating to

64

OEPC's Exhibit C80-related Applications, regardless of which Party prevails on the merits. It contends that Andes' late production of Exhibit C80 left OEPC with no option other than to seek leave to add new claims. It argues that Andes should not be awarded fees for a motion necessitated by Andes own non-production of a document that later required its counsel to "correct the record." It also contends that the Tribunal's denial of the Applications on the ground that OEPC had failed to show a good-faith basis, from a factual and legal standpoint, for allowing it to add the new claims and for discovery, does not mean that OEPC did not have a good-faith basis for seeking leave to amend in the first place.

196.     OEPC also contends that no fees should be awarded to Andes in relation to OEPC's Renewed Application for Leave to Amend because, among other things, the Tribunal had specifically provided in PO7 that OEPC could apply for leave to resubmit any or all of its applications after the conclusion of the evidentiary hearing scheduled for December 2022. Again, it contends that the Tribunal's denial of the Renewed Application on the ground that OEPC had failed to show a good-faith basis, from a factual and legal standpoint, for allowing it to add the new claims, does not mean that OEPC did not have a good-faith basis for renewing its application and seeking leave to amend.

197.     Finally, OEPC contests the reasonableness of the amount of Andes' fee requests with regard to the particular applications the Parties made to the Tribunal. This includes Andes' Application for Security for Costs; the Parties' Cross-Applications on Count III; and OEPC's Application to Compel Live Witness Testimony.

198.     In its reply, Andes contends that OEPC should not be awarded any attorneys' fees and costs unless it prevails on its claims. It maintains that the Tribunal should apply the "costs follow the event" rule and consider the relative degree of success of the Parties' claims and defenses.

199.     Andes contends that OEPC complicated the proceedings by ignoring the existence and effect of the Andes-OEPC Final Award, which approach required Andes to repeat the Andes-OPEC Tribunal's findings at every procedural juncture.

200.     Andes further contends that OEPC is not entitled to an attorneys' fee award for bringing its applications to raise new claims based on Andes' disclosure of Exhibit C80. It further argues

that OEPC should have awaited the completion of Andes' document-collection verification process before filing its Exhibit C80 Applications because that process revealed that there were no other responsive documents. It states that the evidentiary hearing in December 2022, in particular the testimony of Mr. Garcia, did not support OEPC's claims of a "side deal" or any "negotiations" prohibited by the Letter Agreement. It notes that OEPC's Exhibit C80-related applications depended on speculation with respect to material issues, which the Tribunal pointed out in PO12 and PO14.

201.    Andes maintains that even though its requested costs are higher than OEPC's costs, Andes' request is reasonable in light of the circumstances, including the total amount claimed by OEPC from Andes (more than $300 million). It also notes that its costs were increased by the need to respond to the many unsuccessful applications made by OEPC. Furthermore, the complexity of the issues raised by OEPC's claims required Andes to defend on the basis of the doctrines of res judicata and collateral estoppel, which in turn required it to review the whole procedural history of the Andes-OEPC Arbitration for the Tribunal's understanding, as well as to adduce expert evidence on the oil and gas industry to rebut OEPC's allegations based on the testimony of its expert (Mr. Hall). It further argues that it was required to employ significant resources in preparing objections and responding to the five unsuccessful applications that OEPC filed.

### B.    Tribunal's Analysis and Decision

202.    Having considered the Parties' applications, the Tribunal finds that, as a general matter, Andes, as the prevailing party in this Arbitration, should be awarded its reasonable attorneys' fees and costs. In determining the particular items for which Andes' claimed costs should be upheld, and the specific amounts that should be awarded, the Tribunal has considered factors such as the Parties' relative degree of success in their claims and defenses and the Parties' conduct during the course of the Arbitration, including whether the Parties took positions that caused unnecessary costs and delay. The Tribunal also applied its own judgment and experience in assessing whether the amount of the attorneys' fees and costs was reasonable as well as whether the amount sought by a Party was proportionate in relation to the other Party's claimed attorneys' fees and hours.

203.    Both Parties have requested an award of costs under four categories: (1) attorneys' fees (including legal assistant and litigation support costs); (2) costs and disbursements incurred by

counsel; (3) factual witness and expert witness costs; and (4) arbitration costs. The Tribunal awards such costs as follows:

### 1. Attorneys' Fees

204.    The Tribunal finds that Andes is entitled to recover from OEPC the following amounts as attorneys' fees:

| | |
|---|---|
| Request for Arbitration/Answer to Request for Arbitration | **$48,627.60** |
| Constitution of Arbitral Tribunal | **$45,000** |
| Case Management Conference, Preliminary Hearing and Issuance of PO1 | **$50,000** |
| Andes' Application for Security for Costs and OEPC's Opposition to Andes' Application | **$300,000** |
| OEPC's Statement of Claim/Andes' Statement of Defense[156] | **$300,000** |
| Document Production Phase[157] | **$100,000** |
| OEPC's Statement of Reply/Andes' Statement of Rejoinder | **$234,094.20** |
| OEPC's Application to Compel Witness Testimony | **$75,000** |
| Parties' Applications on Count Three | **$183,351.15** |
| OEPC's Application to Raise New Claims and Discovery Relief[158] | **$400,000** |
| Preparation and Participation in Evidentiary Hearing | **$750,000** |
| Parties' Post-Hearing Briefs | **$154,771.65** |
| OEPC's Renewed Application[159] | **$40,000** |

---

[156] The Tribunal has not awarded any attorneys' fees to Andes for its Application for Leave to File A Dispositive Motion, which Application the Tribunal denied.

[157] The Tribunal has largely denied Andes' request for attorneys' fees in the Document Production Phase. First, Andes has not shown that these costs were incurred mainly in connection with the present Arbitration as opposed to in connection with the DCL Action. Second, the claimed fees also appear to relate to the extensive document-collection verification process that Andes undertook in October 2022 and for which Andes bears responsibility. It was precipitated by Andes' inaccurate response to OEPC's Document Request No. 9, Andes' late discovery and production of Exhibit C80, Andes' need to correct the record, and Andes' felt need to give assurances to the Tribunal and OEPC that no other responsive documents existed. Andes should bear these costs.

[158] The Tribunal has not awarded any attorneys' fees against OEPC based on the fact that it filed its original Application for Leave to Amend to add new claims. The relevant consideration in the Tribunal's decision to award fees was whether the Application was successful. As explained in PO15, in which the Tribunal struck the Expert Report submitted as Appendix B to OEPC's Application for Fees and Costs, when the Tribunal denied leave in PO12, it did not find or imply that OEPC lacked good faith in bringing that original Application for Leave to Amend.

[159] The Tribunal has not awarded any attorneys' fees against OEPC based on the fact that it filed its Renewed Application for Lease to Amend. The relevant consideration in the Tribunal's decision to award fees was whether the Renewed Application was successful. As explained in PO15, in which the Tribunal struck the Expert Report submitted

| Preparation and Participation and March 27, 2023 Hearing | $242,005.80 |
|---|---|
| **TOTAL** | **$2,922,850.40** |

### 2. Costs and Disbursements

205.　　The Tribunal finds that Andes is entitled to recover from OEPC the following amounts as costs and disbursements:

| E-Discovery[160] | **$27,000.00** |
|---|---|
| Translation services | **$14,635.18** |
| Travel (Taxi, Airfare, Hotel) | **$15,675.30** |
| Legal Research Databases | **$10,479.31** |
| Courier | **$270.78** |
| External Printing | **$6,242.00** |
| **TOTAL** | **$74,302.57** |

### 3. Factual Witness and Expert Witness Costs

206.　　The Tribunal finds that Andes is entitled to recover from OEPC the following amounts as costs for factual witnesses and expert witness:

| Timothy Martin | **$190,446.03** |
|---|---|
| Diego Garcia Carrion | **$16,725.31** |
| **TOTAL** | **207,171.34** |

### 4. Arbitration Costs

207.　　The Tribunal finds that Andes is entitled to recover from OEPC the following amounts as arbitration costs:

---

as Appendix B to OEPC's Application for Fees and Costs, when the Tribunal denied leave in PO14, it did not find or imply that OEPC lacked good faith in bringing that Renewed Application for Leave to Amend.

[160] The Tribunal has largely denied Andes' request for E-discovery costs for the same reasons it largely denied Andes' request for attorneys' fees in the Document Production Phase. *See* note 157, *supra.*

| Incurred AAA/ICDR administrative and arbitrators' fees | $331,878.90 |
|---|---|
| Court reporter fees | $47,328.93 |
| Evidentiary Virtual Hearing costs | $60,152.22 |
| Supplemental Hearing costs | $361.14 |
| Other Professional fees | $50,908.43 |
| **TOTAL** | $490,629.62 |

### 5. Summary of Costs

208. Based on the foregoing, the Tribunal awards **$3,694,953.93** to Andes and against OEPC for attorneys' fees and costs pursuant to Rules R–47(c) and (d) of the AAA Commercial Arbitration Rules and paragraph 3(f) of Exhibit H to the Farmout Agreement. The amounts awarded are summarized as follows:

| Attorneys' Fees | $2,922,850.40 |
|---|---|
| Costs and Disbursements | $74,302.57 |
| Factual Witness and Expert Witness Costs | $207,171.34 |
| Arbitration Costs | $490,629.62 |
| **TOTAL** | $3,694,953.93 |

209. All other requests by Andes for attorney's fees and costs are denied. OEPC's request for attorneys' fees and costs is denied in its entirety.

210. The Tribunal directs the AAA to disburse the funds held in escrow under PO3 to Andes in the amount of the attorneys' fees and costs awarded.

## VII. CONCLUSION AND AWARD

Through this Final Award and for the reasons set forth above, the Tribunal by majority hereby **Declares**, **Orders** and **Awards** as follows:

   A. Respondent's request to dismiss Claimant's claims as barred by the doctrine of res judicata is **GRANTED**.

**B.** Claimant's claims for breach of contract are **DENIED.**

**C.** Respondent's request to be awarded its attorneys' fees and costs is **GRANTED** in the amount of **$3,694,953.93**.

**D.** Claimant is **ORDERED** to pay the amounts awarded in this Section VII of the Final Award within 30 days from the date of the transmittal of this Award to the Parties. This payment shall be effected by the American Arbitration Association disbursing the funds held in escrow pursuant to PO3 in the amount awarded.

**E.** This Final Award renders a final decision on the merits on all claims submitted to the Tribunal. All other claims or requests for relief by the Parties, to the extent not expressly granted and determined herein, are **DENIED.**

**F.** This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute the Final Award of this Panel.

We hereby certify that, for the purposes of Article 1 of The New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York City, New York, United States of America.

July _10_ 2023      _Lucy F. Reed_____
                                     Lucy F. Reed, Esq., Arbitrator

July __, 2023      _____
                                  John J. Buckley, Jr., Esq., Arbitrator

**B.** Claimant's claims for breach of contract are **DENIED**.

**C.** Respondent's request to be awarded its attorneys' fees and costs is **GRANTED** in the amount of **$3,694,953.93**.

**D.** Claimant is **ORDERED** to pay the amounts awarded in this Section VII of this Final Award within 30 days from the date of the transmittal of this Final Award to the Parties. This payment shall be effected by the American Arbitration Association disbursing the funds held in escrow pursuant to PO3 in the amount awarded within 30 days of the date of this Final Award.

**E.** This Final Award renders a final decision on the merits on all claims submitted to the Tribunal. All other claims or requests for relief by the Parties, to the extent not expressly granted and determined herein, are **DENIED**.

**F.** This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute the Final Award of this Panel.

We hereby certify that, for the purposes of Article 1 of The New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York City, New York, United States of America.

July ___, 2023        _____
                      Lucy F. Reed, Esq., Arbitrator

July 8, 2023          _____
                      John J. Buckley, Jr., Esq., Arbitrator

I, Lucy F. Reed, Esq., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

July 10, 2023       _Lucy F. Reed_

                             Lucy F. Reed, Esq., Arbitrator

State of New York
County of New York

On this 10th day of July 2023, before me personally came and appeared Lucy F. Reed, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

July 10, 2023       _Jennifer Gabrielle Deputy_

                             Notary Public



I, John J. Buckley, Jr., Esq., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

July 8,2023 _____
John J. Buckley, Jr., Esq., Arbitrator

City of Washington
                    SS
District of Columbia

On this 8th day of July 2023, before me personally came and appeared John J. Buckley, Jr., to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

July 8th,2023 _____
Notary Public

Robert Kotchenreuther II
Notary Public, District of Columbia
My Commission Expires 12-14-26